**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| SUSAN J. BALDWIN, | ) |
| | ) |
| | ) |
| | ) **Case #: 11 CIV 7591** |
| Plaintiff, | ) |
| | ) J. Paul G. Gardephe (PG) |
| v. | ) M.J. Henry Pitman (HP) |
| | ) |
| GODDARD RIVERSIDE COMMUNITY CENTER, | ) ECF CASE |
| | ) |
| | ) |
| | ) **AMENDED** |
| Defendant. | ) **COMPLAINT** |

_____

Susan Baldwin refused to pass over Russian applicants for vacant apartments when instructed to do so by Defendant's Executive Director, Stephan Russo.  She then participated in a former subordinate's discrimination lawsuit, and was subsequently fired from the post she had held for 16 years.  Mrs. Baldwin was fired without any prior warning, notice, or recourse to internal grievance procedures**.**

Susan had refused to sign an insurance agent's fallacious write-up of her statements concerning the terminated subordinate and the events leading to his firing.  Susan testified truthfully at her deposition – where she was not represented by her employer's counsel – and thereby provided information beneficial to her former subordinate.  Afterwards, her previously cordial relationships with her supervisors soured, and she was ostracized until her ultimate termination.

Susan Baldwin brings suit to remedy Defendant Goddard Riverside Community Center's unlawful retaliation.

Plaintiff, Susan J. Baldwin ("Susan", "Susan Baldwin", or "Mrs. Baldwin") by and through her undersigned counsel, Joshua Alexander Bernstein and Josh Bernstein, P.C., for her Complaint against Defendant Goddard Riverside Community Center ("Goddard"), alleges as precedes and follows.  In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Susan Baldwin hereby demands a jury trial of this action.

### Nature of the Action: Unlawful Retaliation in Violation of the New York City Human Rights Law, the New York State Human Rights Law, Title VII of the Civil Rights Act, and the New York State Labor Law

1. Mrs. Baldwin brings this action under the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101 et. seq., the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296 et. seq., Title VII of the Civil Rights Act ("Title VII"), 42 USC § 2000e et. seq., and the New York State Labor Law ("NYSLL"), N.Y. Labor Law § 201-d, to secure relief against Defendant for harassing and firing Plaintiff in retaliation for her participation in a civil rights investigation/lawsuit; and/or her opposition to a civil rights violation (whether in housing or employment); and/or her engagement in protected activity.

### Jurisdiction and Venue

2. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e et. seq., and 28 U.S.C. § 1367 (supplemental jurisdiction).

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## The Parties

4. Plaintiff Susan J. Baldwin, a sixty-nine (69) year old female, is a citizen of New
   York residing at 90 LaSalle Street, Apartment 18A, New York, NY 10027.

5. Upon information and belief, Defendant Goddard Riverside Community Center is
   a not-for-profit corporation registered to receive service of process via the
   Department of State at 593 Columbus Ave, New York, NY 10024. Goddard
   Riverside Community Center operates a network of federally subsidized housing
   facilities including Phelps House, a subsidized housing unit for the elderly.

## Factual Allegations Demonstrating Unlawful Retaliation

**Susan Excels as Site Manager of Phelps House and Maintains Positive Relationships
With Her Supervisors for a Period of 14 Years**

6. Susan Baldwin began her employment with Goddard Riverside Community
   Center in July 1994 as the Site Manager for Phelps House, a title she held until
   her termination on October 6th, 2010.

7. Susan commenced her employment with Goddard under Executive Director
   Bernard Wohl and Associate Directors Barbara Reinhardt & George Kahler, and
   later Ellen Eisenmann. Susan always excelled in her position at Phelps House,
   cultivating excellent relationships with Mr. Wohl, Mrs. Reinhardt, Mr. Kahler &
   Ms. Eisenmann, along with a number of long-term residents and subordinate staff.

8. Sometime in 1998 Mr. Wohl appointed Stephan Russo ("Russo" or "Mr. Russo")
   - the current Executive Director of Goddard Riverside Community Center – to the
   position of Deputy Director and began grooming him for the Executive Director

position.  Susan had previously known Mr. Russo through her husband, and had a positive relationship with him.  Mr. Wohl retired sometime in 1999, and Mr. Russo assumed the Executive Director position.

9. Shortly after assuming the Executive Director position, Mr. Russo hired Gerald Mascuch as Director of Housing for Goddard.  Susan had an excellent relationship with Mr. Mascuch as well.

10. Susan worked well with the new leadership and the 2000s passed relatively unremarkably.  During this time period, Susan received no documented criticism of her job performance of any kind.

**Susan Refuses to Discriminate Against Russian Applicants for Vacant Apartments**

11. As Site Manager for Phelps House, Mrs. Baldwin was responsible for filling vacancies in the building.  Phelps House kept a list of tenants interested in units in the building, and when a unit became available, Mrs. Baldwin would send a letter to the next applicant on the list and work towards filling the vacancy with whoever was at the top of the list, so long as they qualified and had kept their application fresh.

12. Sometime on or about 2005, Stephan Russo told Mrs. Baldwin that he didn't want any more Russians in Phelps House.  He provided a rationale that if too many Russians were in the building, they would start demanding a Russian manager, and Russian social workers etc…

13. Mrs. Baldwin told Mr. Russo that passing over Russian applicants would be illegal, and that she would continue to fill vacancies based upon who was next on the list, regardless of their ethnicity or national origin.

14. Over the following years, Mr. Russo increasingly pressured Mrs. Baldwin to pass over Russian applicants to Phelps House.  Every time Mr. Russo would do so, Mrs. Baldwin would tell Mr. Russo that she would not follow his directive, but instead, the law. On one occasion, in response to Mrs. Baldwin's rejoinder that she would follow the law instead of discriminating against Russian applicants, Mr. Russo told her to nonetheless pass over Russian applicants and say that he made her do it if it ever became a problem.

15. During the same time period – the late 2000s – Mr. Russo also told Mrs. Baldwin's assistant, Mercedes Rankin ("Mrs. Rankin") that Phelps house should not be filled with Russians, but instead a mix of ethnicities and/or nationalities. Mr. Russo would intermittently raise the subject with Mrs. Rankin, asking her the ethnicity/national origin of new tenants, and reminding her not to fill the building with Russians.

16. Also during the same time period, Mr. Russo asked Jose Robles ("Robles" or "Mr. Robles"), the superintendent for Phelps house, to spy on Mrs. Baldwin in regards to filling vacancies with Russian tenants.

17. Mr. Russo told Mr. Robles to "watch" Susan, and that if she brought any more Russians to Phelps House, to come to his office and let him know.

18. Mr. Russo made similar comments to Mr. Robles on multiple occasions, including in front of Mercedes Rankin, and also in front of Doris Colon, Director of Social Services for Phelps House.

19. Sometime in late 2008, a number of Phelps House tenants died in a short period of time opening a number of vacancies.  Mrs. Baldwin worked to fill those vacancies based upon who was at the top of the tenant-applicant list.

20. Cathy Herman ("Herman"), Goddard's newly appointed Director of Housing, visited Phelps House while Mrs. Baldwin was working to fill these vacancies. During a conversation with Herman, Mrs. Baldwin and Mrs. Rankin about the vacancies, Mrs. Rankin brought up that Mr. Russo was going to be upset because the tenants who would be filling the block of vacancies were predominantly Russian tenants that Mrs. Baldwin was bringing in because they were on the top of the list.

21. During this conversation, Herman was informed that Stephan Russo had directed Mrs. Baldwin to pass over Russian applicants, and Mrs. Baldwin told Herman that she would not pass over Russian applicants, but would instead continue to fill vacancies based upon who was on the list.

22. Towards the end of this conversation, Herman told Mrs. Baldwin and Mrs. Rankin that she would bring the subject up with Mr. Russo.

23. Some period of time after this conversation, Herman visited Phelps House and told Mrs. Rankin that they have to bring in Russians who were on the top of the list, and that it would be illegal not to do so.

24. During this conversation, Herman told Mrs. Rankin that when she raised the issue with Salvatore Uy, an Associate Director, he professed not to know that passing over Russian applicants was illegal, and Herman corrected him that such a practice was, in fact, illegal.  Herman also told Mrs. Rankin that she had told Mr.

Russo that such a practice was illegal, and that he could not direct his staff to pass over Russian applicants.

25. Even after this conversation, Mr. Russo kept tabs on whether vacancies in Phelps House were being filled by Russian tenants.  He would ask Mrs. Rankin "who are you bringing in" in reference to a vacancy at Phelps House, which Mrs. Rankin knew to mean what the ethnicity/national origin of a prospective tenant was, and she would tell Mr. Russo the ethnicity/national origin of said tenant.

26. Sometime after 2007 or 2008, Defendant began retaliating against Mrs. Baldwin for her opposition to discriminatory housing practices (and/or her opposition to discrimination directed against Mr. Robles, as will be discussed below).

27. For example, Defendant cut Mrs. Baldwin out of the loop with important third-party entities, and acted like she did not even exist at an annual meeting with the Board of Directors.

**Stephan Russo Accuses the Maintenance Staff of Stealing Alcohol from a Storage Room**

28. Over the course of her tenure at Goddard, Susan became friends with Jose Robles. Susan was responsible for all of Phelps House, and was therefore in constant contact with Mr. Robles in his capacity as superintendent.  Over the years, Jose's diligent work ethic and professionalism earned him Susan's highest regard.

29. In his capacity as superintendent, Mr. Robles was responsible for the maintenance staff, among other duties.

30. Unbeknownst to Susan or Mr. Robles, the Phelps House Development Office had been storing alcohol for an annual book fair in a basement storage room.  This

room housed books to be sold at the yearly fair, which was a fundraiser for Goddard, and featured complimentary cocktails.

31. Sometime in late September 2007, Mr. Russo called a meeting attended by Mr. Russo, Gerald Mascuch, Mrs. Baldwin, her assistant Mercedes Rankin, Mr. Robles and the maintenance staff.

32. At this meeting, Mr. Russo announced that a substantial amount of expensive liquor had gone missing from the basement book room.  He seemed extremely upset and accusatory.

33. In response, Mr. Robles suggested that they call the police in order to investigate the theft.  Mrs. Baldwin took Mr. Robles's comment as his standing up for the maintenance staff, thinking that they had been implicated by Mr. Russo.

34. Mr. Russo became outraged at the suggestion of calling the police, raising his voice in response and communicating extreme disdain with his body language.

**Stephan Russo Fires Mr. Robles Citing "Lack of Trust"**

35. On or about October 10, 2007, Jose Robles was fired by Mr. Russo.  Upon information and belief, Mr. Russo called Jose into his office, told him that he couldn't trust him anymore, and terminated Jose on the spot.

36. Upon information and belief, Mr. Russo tried to convince Jose to sign a document indicating that he was retiring from Phelps House.  Jose refused.

**Jose Robles Challenges his Termination**

37. Sometime thereafter, upon information and belief, Mr. Robles filed a grievance with Goddard concerning his termination.

8

38. A little over a month subsequent to Jose's termination, Mr. Russo called Susan into his office where she met Eric Rosenblum, a member of Goddard's Board of Directors who also served as a sort of in-house counsel.

39. Mr. Rosenblum told Susan that he needed all of Susan's "write-ups" on Jose. Susan had never written-up Jose, and she told Mr. Rosenblum as much. Mr. Rosenblum was very aggressive and made a derogatory comment about Jose, to which Susan rejoined "should I [have write-ups on Jose]?" Susan told Mr. Rosenblum she would fetch Jose's personnel file, which she did.

40. Sometime in late January, 2008, Gerald Mascuch resigned from his position as Director of Housing. Before he announced his resignation to the staff, Mr. Mascuch told Susan that he would be leaving Goddard. During this conversation, he told Susan that he had been roped into the firing of Jose; that he had not wanted to be involved in the firing of Jose; and that his forced involvement in Jose's termination motivated his resignation.

41. Subsequent to Mr. Mascuch's resignation - sometime on or around February, 2008 - Goddard hired a Mr. Salvatore Uy as an additional Associate Director.

42. Sometime thereafter, in July 2008, Defendants hired a new superintendent for Phelps House. Despite the fact that the superintendent would report directly to Mrs. Baldwin and work most closely with Mrs. Baldwin, Mrs. Baldwin was not allowed to choose who the new superintendent would be. The new superintendent was hired essentially without any input from Mrs. Baldwin.

**Jose Robles Sues Goddard Riverside Community Center for Discrimination; Susan Refuses to Fudge the Facts About His Job Performance and the Events Leading to His Termination**

43. On May 23, 2008 Mr. Robles filed a discrimination suit against Goddard in the United States District Court for the Southern District of New York.

44. Sometime in late May or early June 2008, an employee of Goddard's insurance carrier visited Phelps House and interviewed a number of staff members about Jose, including Susan.

45. During her interview, the insurance agent read back to Susan a comment she had not made. The interviewer's fabrication prompted Mrs. Baldwin to ask for a copy of the insurance agent's written report of the interview.

46. Susan received the written report a few weeks later, and was shocked to find that the written document twisted her words beyond recognition.  The transcript made it seem that Mrs. Baldwin had considered Jose's "call the police" comment aggressive and insubordinate, when in fact Mrs. Baldwin had relayed the comment as even-handed and not at all insubordinate.  All information that could be potentially beneficial to Jose (i.e. that Mrs. Baldwin had not been consulted prior to his termination, despite the fact that she was his direct supervisor) was omitted from the report, and other statements were cited out of context as to change their implication.

47. Susan took the fallacious write-up home, drafted a corrected summation of her interview, and sent it to the insurance company.

**Susan Provides Testimony Beneficial to Mr. Robles at her Deposition**

48. Sometime on or around June or July 2008, Defendant hired Catherine Herman to replace Gerald Mascuch as Director of Housing for Goddard Riverside

Community Center.  Susan had a relatively cordial relationship with Ms. Herman from the date of her hire until her deposition in the Robles matter.  During this time period, Ms. Herman deferred to Susan's long-standing experience and expertise in running Phelps House, and Susan was allowed to go about her business as she had under her previous supervisors.

49. While Susan had a relatively cordial relationship with Ms. Herman until her deposition, there was some deterioration in their relationship subsequent to the conversation where the issue of passing over Russian tenants was raised.  For example, Ms. Herman cut Susan out the relationship with a new third-party management company in late 2008 by bringing management company staff to Phelps House while Susan was out of work due to a death in the family despite having told Susan that she would refrain from doing so until Susan returned from leave.

50.  In July, 2009, Susan was deposed in connection with the Robles matter.  Counsel for Goddard stopped by Susan's office to tell her the time, date and location of her deposition, and that counsel for Goddard would *not* be representing her at the deposition.

51. At one point during her deposition, it became clear that the parties were operating off of Goddard's insurance agent's fallacious write-up of Susan's interview. Susan had brought her corrected version of her interview with Goddard's insurance agent to the deposition, which was then introduced into evidence. Susan put on the record that the original version did not accurately represent her

statements to the insurance agent, and that she had sent the corrected copy to the insurance agent.

52. Susan also testified at her deposition that she had not been consulted prior to Mr. Robles's termination, despite the fact that she was his direct supervisor.  She also justified Mr. Robles "call the police" statement, and stated that she believed Mr. Russo had taken that comment as an attack on his authority, though she did not take it that way.

**Susan's Supervisors Ostracize and Mistreat Susan Subsequent to Her Deposition**

53. Prior to her deposition, Susan had a relatively cordial relationship with Mr. Russo. He would poke his head into her office from time to time, and would call her directly whenever there was a facilities issue with Phelps House.

54. Subsequent to her deposition, Mr. Russo isolated and avoided Susan.  He stopped calling Susan directly, and instead would communicate the need to address facilities issues with Doris Colon, the Director of Social Services for Phelps House.  Ms. Colon would then contact Susan and relate whatever facilities issues Mr. Russo wanted addressed.  Ms. Colon is in the social services department and her duties have nothing to do with the physical facility.  Mr. Russo would also communicate to Susan through Catherine Herman on issues where he previously would have simply picked up the phone and called Susan.

55. After her deposition, Mr. Russo became cold towards Susan, and his physical visits to her office diminished drastically.  Whereas previously he had stopped by Susan's office when he was visiting the facility, Mr. Russo would now spend his time at Phelps House in the social service department.  On the rare occasions

when he was in Susan's section of the building, Mr. Russo would ignore Susan and speak to her assistant, Mercedes Rankin, instead.

56. Previously Mr. Russo would say hi to Susan at monthly director meetings and nonverbally solicit her reaction to points he was making at the meetings.  After her deposition, Mr. Russo ignored Susan at these meetings entirely.

57. Subsequent to Susan's deposition, Mr. Russo began to give credit for positive developments Susan was responsible for to individuals who had nothing to do with the issue at hand.

58. For example, Phelps House was originally supposed to be furnished with electrified doors.  Many of the tenants complained about the lack of electrified doors, which were an important concern to the elderly residents of the facility, many of whom are wheel-chair bound.  On her own initiative, through lengthy and time-consuming efforts, Susan was able to secure a contractor who electrified the doors on or about August or July of 2010.

59. In September 2010, Mr. Russo called a special meeting with the tenants at a time he knew Susan would be on vacation.  At this meeting, Mr. Russo emphasized and lauded the door's electrification.  He gave Doris Colon credit for coordinating and effectuating the electrification – even though as the Director of Social work Ms. Colon has nothing to do with this sort of facilities issue and, in fact, played no role in the door's electrification – and also credited Catherine Herman.  Mr. Russo did not give any credit to Susan, at whose sole initiative the doors were electrified.

60. Subsequent to Susan's deposition, Catherine Herman also began to mistreat her.

61. Ms. Herman began micromanaging Susan's affairs and sabotaging her work performance.  Ms. Herman contrived deficiencies in Susan's job performance and would constantly interrupt Susan with minor matters when Susan was working on pressing and important issues in order to undermine her performance.

62. Ms. Herman also ignored Susan's institutional knowledge and expertise subsequent to her deposition when she had deferred to Susan previously.  She ignored Susan's recommendations, and then implemented some of them as soon as Susan was gone.

**Susan is Fired Without Warning or Notice**

63. On October 6, 2010, Salvatore Uy called Susan at around 9 A.M. to inform her that he and Ms. Herman would be stopping by her office to discuss bedbug issues in the building.

64. Just after 10 o'clock that morning, Mr. Uy and Ms. Herman appeared at Susan's office.  They did not come to discuss bedbugs.  Rather, they handed Susan a termination letter and told her that she was being fired.

65. Susan skimmed the termination letter, which referenced issues "discussed and documented in the last several months".  She was shocked to be fired on the spot, as no conversations had taken place regarding her (purportedly poor) performance, and she had received no performance improvement plan or any other document indicating performance deficiencies in the period leading up to her termination.

66. Susan asked Mr. Uy and Ms. Herman what these alleged issues were.  They ignored her question and told Susan that she had to leave.

67. Susan's husband Will arrived at Phelps House within the hour to pick her up.  By chance, Catherine Herman passed by when Will was there and he asked Ms. Herman what the alleged issues were.  In response, Ms. Herman printed out a grand total of two documents.  One document was an email from 2008 regarding a tax issue.  The other was an email Ms. Herman had sent to Susan in February, 2009.

**Goddard Conducts a Sham Investigation Into Susan's Termination**

68. Under Goddard's personnel policies there is a three-step grievance procedure for challenging management actions. Susan's termination letter states that under Goddard's personnel policies Susan was entitled to 30 days' notice of termination. Because Susan was terminated without this 30 days notice, she was not provided with the opportunity to challenge her (imminent) termination while still employed at Goddard, which may have affected the rigor of upper management's inquiry into the affair.

69. Nonetheless, Susan invoked the grievance procedure subsequent to her termination.  Goddard ultimately produced a packet of documentation supposedly justifying her termination, consisting mainly of emails concerning run-of-the-mill workplace hiccups of the sort that one could dig up on even the most sterling employee.

70. Despite Susan's vigorous challenge of her firing, Goddard ultimately decided that her termination was justified and refused to reinstate Susan to the position that she had held for 16 years.

71. Susan's EEOC charge was marked "received" on May 6, 2011, and she received her right to sue letter on September 14, 2011.

**<u>First Cause of Action:</u>**
**<u>Retaliation in Violation of the New York City Human Rights Law (Employment)</u>**

72. Plaintiff repeats and realleges the allegations contained in paragraphs 1-71 inclusive as if they were fully set forth herein.

73. The aforesaid actions of the defendant constitute a violation of the New York City Human Rights Law, New York City Administrative Code § 8-101 <u>et. seq.</u> by terminating plaintiff on the basis of her participation in a civil rights proceeding and/or her opposition to unlawful discrimination.

74. As a result of defendant's violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages.  Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and, because defendant's actions were intentional, malicious, and without justification or excuse, punitive damages.

**<u>Second Cause of Action:</u>**
**<u>Retaliation in Violation of the New York State Human Rights Law</u>**

75. Plaintiff repeats and realleges the allegations contained in paragraphs 1-71 inclusive as if they were fully set forth herein.

76. The aforesaid actions of the defendant constitute a violation of the New York State Human Rights Law, New York Executive Law § 296 <u>et. seq.</u> by terminating plaintiff on the basis of her participation in a civil rights proceeding and/or her opposition to unlawful discrimination.

77. As a result of defendant's willful violation of the New York State Human Rights Law, plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages.  Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and civil penalties.

### Third Cause of Action:
### Retaliation in Violation of Title VII of the Civil Rights Act

78. Plaintiff repeats and realleges the allegations contained in paragraphs 1-71 inclusive as if they were fully set forth herein.

79. The aforesaid actions of the defendant constitute a violation of Title VII of the Civil Rights Act ("Title VII"), 42 USC § 2000e et. seq., by terminating plaintiff on the basis of her participation in a civil rights proceeding and/or her opposition to unlawful discrimination.

80. As a result of defendant's willful violation of the Civil Rights Act, plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and, because defendant's actions were intentional, malicious, and without justification or excuse, punitive damages.

### Fourth Cause of Action:
### Retaliation in Violation of the New York City Human Rights Law (Housing)

81. Plaintiff repeats and realleges the allegations contained in paragraphs 1-71 inclusive as if they were fully set forth herein.

82. The aforesaid actions of the defendant constitute a violation of the New York City Human Rights Law, New York City Administrative Code § 8-101 et. seq. by terminating plaintiff on the basis of her opposition to unlawful discrimination.

83. As a result of defendant's violation of the New York City Human Rights Law, plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages.  Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and, because defendant's actions were intentional, malicious, and without justification or excuse, punitive damages.


WHEREFORE, Plaintiff Susan Baldwin requests judgment against Defendant Goddard Riverside Community Center, as follows: That this Court order i) Defendant to reinstate the plaintiff; ii) Defendant to pay monetary damages in an amount to be determined at trial including compensatory damages, back pay, front pay, interest, emotional distress/pain & suffering damages, liquidated damages, punitive damages, and civil penalties & costs, including attorney's fees; iii) an award of such other and further relief as the Court deems just and proper.


Dated: October 8, 2012

<div style="margin-left:50%">

Josh Bernstein, P.C.
*Counsel for Plaintiff*

By:_____/s/_____
Joshua Alexander Bernstein

116 West 23rd Street, 5th Fl.
New York, NY 10011
(212) 537-9412
jbernstein@jbernsteinpc.com

</div>