UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN J. BALDWIN,

        Plaintiff,

        v.

GODDARD RIVERSIDE COMMUNITY
CENTER,

        Defendant.

11-CV-7591 (PGG)(HP)
**ORAL ARGUMENT REQUESTED**

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
(212) 692-1000
Attorneys for Defendant
Goddard Riverside Community Center

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1

SUMMARY OF FACTS ..............................................................................................................3

    A.    Plaintiff and the Robles Lawsuit............................................................................. 3

    B.    Plaintiff's Alleged Opposition to Housing Discrimination .................................... 4

    C.    Plaintiff's Performance Issues and Failure to Meet Her Supervisors' Expectations........................................................................................................... 5

    D.    Plaintiff's Post Termination Grievance .................................................................. 7

    E.    Plaintiff Files a Lawsuit Claiming Retaliation....................................................... 7

ARGUMENT .................................................................................................................................7

    I.    Any TITLE VII Claims that Accrued More Than 300 Days Before the Filing of Plaintiff's Charge of Discrimination with the EEOC Are Time Barred.....................................................................................................................8

    II.    There Is No Causal Connection Between Plaintiff's Support of Robles and Her Termination......................................................................................................9

    III.    Plaintiff Was Not Retaliated Against For Opposing Housing Discrimination.......................................................................................................10

    IV.    Plaintiff's Speculation Dooms Her Claim ............................................................11

    V.    Plaintiff Was Terminated For a Legitimate Non-Retaliatory Reason and There Is No Pretext ............................................................................................12

CONCLUSION............................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..................................................................11

Caskey v. County of Ontario, 800 F. Supp. 2d 468 (W.D.N.Y. 2011)..........................................10

Cifra v. General Electric Co., 252 F.3d 205 (2d Cir. 2001).........................................................12

Cioffi v. Averill Park Central School District Board of Education, 444 F.3d 158 (2d Cir. 2006) ..........................................................................................................................................9

Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656 (S.D.N.Y. 2011) .........................9

Echenoza v. City of New York, 1997 U.S. App. LEXIS 28452 (2d Cir. 1997).............................11

Ennis v. Sonitrol Mgmt. Corp., 2006 U.S. Dist. LEXIS 2599 (S.D.N.Y. Jan. 25, 2006)...............13

Feldman v. Looms, No. 98-9680, 1999 U.S. App. LEXIS 25092 (2d Cir. Oct. 4, 1999) .............12

Giles v. NBC Universal, Inc., No. 10 CV 7461 (DAB), 2011 U.S. Dist. LEXIS 106171 (S.D.N.Y. Sept. 20, 2011).................................................................................................. 9-10

McGullam v. Cedar Graphics, Inc., 609 F.3d 70 (2d Cir. 2010) ....................................................8

McIntyre v. Longwood Central School Dist., 380 F. App'x 44 (2d Cir. 2010)....................... 10-11

O'Sullivan v. New York Times, 37 F. Supp. 2d 307 (S.D.N.Y. 1999) ..........................................13

Pilgrim v. McGraw-Hill Cos., 599 F. Supp. 2d 462 (S.D.N.Y. 2009)............................................8

Ragin v. East Ramapo Central School District, 2010 U.S. Dist. LEXIS 32576 (S.D.N.Y. Mar. 31, 2010)...................................................................................................................10

Richardson v. City of New York, 285 F. Supp. 2d 303 (E.D.N.Y. 2003) .......................................8

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011) ................................8

Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F. Supp. 977 (W.D.N.Y. 1996)..........13

Sotomayor v. City of New York, 862 F. Supp. 2d 226 (E.D.N.Y. 2012).........................................8

Underkofler v. Community Health Care Plan, Inc., No. 99-7838, 2000 U.S. App. LEXIS 19040 (2d Cir. Aug. 4, 2000) .............................................................................................12

**Other Authorities**

Local Civil Rule 56.1......................................................................................................................2

Title VII of the Civil Rights Act ................................................................................... 7-8

New York State Human Rights Law ("NYSHRL") ...................................................... 7-8

New York City Human Rights Law ("NYCHRL") ....................................................... 7-8

Defendant Goddard Riverside Community Center ("GRCC"), by and through its attorneys, Duane Morris LLP, respectfully submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff Susan Baldwin ("Plaintiff"), the former Property Manager of GRCC's Phelps House, alleges that she was terminated in October 2010 in retaliation for (1) allegedly supporting a former GRCC superintendent, Jose Robles ("Robles"), in his discrimination lawsuit against GRCC, and (2) opposing GRCC's alleged discriminatory housing practices relating to Russian tenants at various times between *2005 and 2009*. Plaintiff supports her claim with nothing more than inadmissible innuendo, feelings, supposition and legal conclusions.

Plaintiff asserts her termination is retaliatory when in reality, Plaintiff's new supervisors, Catherine Herman ("Herman") and Salvador Uy ("Uy"), determined Plaintiff was not meeting their expectations and made the business decision to separate her employment. Specifically, Plaintiff was disorganized and failed to follow work directives. She was unable (or unwilling) to adapt to the new system utilized by GRCC's new outside management company, Grenadier Realty Company ("Grenadier"). Under Plaintiff's watch, GRCC received an overall rating of "below average" in a HUD audit - a rating which improved only after Herman brought in people from Grenadier to assist. Finally, Plaintiff badly mishandled a bed bug epidemic that struck the Phelps House tenants, ignoring Herman's suggestions and causing further damage and expense to GRCC. Following the bed bug issue, Herman, in consultation with Uy, determined that Plaintiff's performance was unacceptable and separated her. Importantly, Plaintiff acknowledges her work deficiencies and admits she did not always do her job "to the standard that others might wish from me."

Even assuming for purposes of this motion only that Plaintiff engaged in protected activity known to Herman and Uy, Plaintiff cannot establish a causal connection between her termination and the protected activity because too much time (16 months) elapsed between the two events. Nor does she have any admissible evidence that her participation in the Robles lawsuit motivated Herman and Uy to terminate her employment.

Plaintiff's retaliation claim for her opposition to housing discrimination fares no better. Plaintiff cannot establish a causal connection between her protected activity (which began sometime in 2005 and continued to 2009) and her October 2010 termination because years (between one-and-a-half and five) separate the two events. Further, Plaintiff has no admissible evidence that the decision by Uy and Herman (neither of whom directed Plaintiff to pass over Russian tenants) to terminate her had anything to do with her protected activity. Rather, Plaintiff admits that Herman instructed Plaintiff to continue following the United States Department of Housing and Urban Development ("HUD") regulations when it came to placing applicants. Plaintiff's housing discrimination retaliation claim is further weakened by the fact that she confirms no retaliation occurred in the three year period from when she first allegedly opposed housing discrimination (2005) until 2008.

In the end, Plaintiff's retaliation claims rest entirely on speculation: "I really felt – I mean, in looking back, since I was fired, I, you know, I – that's my sense that it was retaliation…in looking back, when I brought my lawsuit, I really felt – I feel that I am on the right track with that speculation." (Local Civil Rule 56.1 Statement of Undisputed Facts ("56.1") ¶ 71). Summary judgment should be granted to Defendant on all causes of action.

## SUMMARY OF FACTS [1]

GRCC is a human services organization that operates five residences including Phelps House, an affordable housing building. (56.1 ¶1). Plaintiff was hired as Property Manager of Phelps House in July of 1994. (56.1 ¶2). As Property Manager, Plaintiff was responsible for filing required certifications, including tenant income certifications and certification of tax credits with HUD, and for monitoring the physical state of Phelps House, which included supervising the superintendent and the maintenance staff. (56.1 ¶¶3, 5).

### A.   Plaintiff and the Robles Lawsuit

In October 2007, Stephan Russo, GRCC's Executive Director, terminated the employment of the Phelps House superintendent, Jose Robles. (56.1 ¶12). Plaintiff alleges she helped Robles find an attorney in late 2007 or early 2008, after he was terminated. (56.1 ¶14).

In or around early 2008, Salvador Uy was hired by GRCC as Associate Director for Operations. (56.1 ¶6) His responsibilities included overseeing the Director of Housing and handling human resources. Id. Catherine Herman was hired shortly thereafter in or around June 2008 as Director of Housing and was Plaintiff's direct supervisor. (56.1 ¶¶7-8).

On July 22, 2008, Plaintiff was interviewed by a third party investigator regarding the Robles lawsuit. (56.1 ¶15). Following this interview, the investigator sent Plaintiff his draft of Plaintiff's statement, which Plaintiff revised and sent back to him. (56.1 ¶¶16-17). No one at GRCC ever brought up the issue of this statement to Plaintiff during her employment at GRCC. (56.1 ¶18).

---

[1] Defendant respectfully refers the Court to the accompanying Local Civil Rule 56.1 Statement of Undisputed Facts ("56.1") for a complete recitation of material undisputed facts.

On or about June 22, 2009, Plaintiff was deposed in the Robles lawsuit. (56.1 ¶ 19). During Plaintiff's employment with GRCC, neither Russo, Uy, nor Herman made any comments to Plaintiff about her involvement in the Robles case. (56.1 ¶¶21-22).

**B.     Plaintiff's Alleged Opposition to Housing Discrimination**

Plaintiff alleges that sometime beginning in 2005 and ending in "2008 or 2009", Russo told her to pass over Russian applicants seeking tenancy at Phelps House six times. (56.1 ¶¶23, 28).[2] As Property Manager, Plaintiff did not have to seek approval from Russo or anyone at GRCC or Phelps House when filling tenant vacancies, as it was her decision (in accordance with HUD regulations) to select a prospective tenant off the waiting list. (56.1 ¶26). In response to Russo's alleged directive, Plaintiff informed Russo that she could not pass over Russian applicants due to the "open list" and that she had to follow HUD regulations. (56.1 ¶27). She ignored Russo's alleged directive and selected at least five Russian applicants to Phelps House. (56.1 ¶¶32-33). Russo never approached Plaintiff to discuss her selection of applicants, nor did he question why she was not following his alleged directive. (56.1 ¶29). Russo never threatened to fire Plaintiff or cut her pay if she did not keep Russian tenants out of Phelps House, nor was her pay or vacation ever docked. (56.1 ¶30). Plaintiff did not consider Russo's alleged directive as a threat (56.1 ¶31).

GRCC has an established Equal Employment Opportunity policy that prohibits retaliation and contains a complaint procedure. (56.1 ¶24). Plaintiff never complained to HUD or any other agency about Russo's alleged directive, nor did she raise this issue when she grieved her termination. (56.1 ¶25).

---

[2] Neither Herman nor Uy ever instructed Plaintiff to pass over Russian applicants. (56.1 ¶ 34). In fact, Herman told Plaintiff to continue doing what she was doing (56.1 ¶35).

4

### C. Plaintiff's Performance Issues and Failure to Meet Her Supervisors' Expectations

When Herman first started at GRCC in June 2008, her first impression of Plaintiff was that her "office was disorganized." (56.1 ¶36). Herman saw that Plaintiff's files (including tenant files) and her desk were in a chaotic state. (56.1 ¶37). This disorganization concerned Herman because she believed that even if Plaintiff's certification calculations were done correctly, they could be obscured by the fact that her files were so disorganized. (56.1 ¶38).[3]

On January 1, 2009, Grenadier replaced T.U.C. Management as GRCC's third party management company. (56.1 ¶39). Plaintiff continued to use the former management company's software system. (56.1 ¶40). Herman concluded that Plaintiff was undermining the transition from T.U.C. Management to Grenadier. (56.1 ¶41).

On or about February 18, 2009, Plaintiff and Herman discussed, among other things, Grenadier's property management system. (56.1 ¶42). Plaintiff admits that she was "on the shrill side" with Herman during this discussion and that she upset Herman. (56.1 ¶43). Herman prepared a summary of this discussion and sent Plaintiff an email on February 20, 2009 in which Herman expressed her dissatisfaction and reminded Plaintiff that "the buck stops with you, then with me, and right now it doesn't look good." (56.1 ¶44).

In or around June 2009, Phelps House received an overall rating of "below average" and "below average in leasing and occupancy" from HUD. (56.1 ¶45). Plaintiff acknowledges the HUD files were "out of place" in 2009 and that she was responsible for the rating. (56.1 ¶46).

---

[3] Herman was apparently not alone in her concern over Plaintiff's maintenance of the files and the possible impact it had on her effective handling of her responsibilities. (Tiliakos Decl., Ex. S (July 7, 2008 letter from T.U.C. Management (GRCC's then-management company) to Uy regarding GRCC's back log of its tax credit re-certification files, the lack of maintenance of these files, and contradictory conversations with Plaintiff concerning these files). *See also* Tiliakos Decl., Ex. B (Herman Dep.) at 89:11-12.

5

Herman arranged for a Grenadier employee to assist Plaintiff for the June 2010 audit. (56.1 ¶48). Thereafter, Phelps House received an "above average" rating in the June 2010 audit. (56.1 ¶48). Herman attributed the improvement largely to the assistance from Grenadier. (56.1 ¶49).

In the summer of 2010, Phelps House had a bed bug issue. (56.1 ¶50). To address and remedy this problem, Herman recommended a vendor (Tri State Cleaning) to Plaintiff. (56.1 ¶51). Plaintiff did not select this vendor and instead chose a different vendor ("Prep for Bed Bugs") despite never receiving a written proposal or estimate before selecting them. (56.1 ¶¶52, 53, 55). Plaintiff acknowledges her chosen vendor performed poorly and "they were not the right selection…" (56.1 ¶54). Ultimately, due to difficulties with "Prep for Bed Bugs", "Tri State Cleaning" had to be brought in to remedy the bed bug issues at Phelps House. (56.1 ¶ 56).

Between the Summer of 2010 and September 13, 2010, Herman had concluded that Plaintiff was unable to carry out her duties and responsibilities as Property Manager of Phelps House and should be terminated (56.1 ¶57). Herman concluded that Plaintiff expressed a negative attitude about GRCC and Grenadier that created a toxic atmosphere, and that she was deficient in: supervising staff and allocating work; her familiarity with the condition of Phelps House on a daily basis; completing tax credit files; and adjusting to Grenadier. (56.1 ¶ 58). Herman also concluded that Plaintiff lacked the competency in handling tenant certifications and re-certifications for HUD Section 8 subsidies and that Plaintiff's failure to accept constructive criticism had "reached the point of being detrimental to [GRCC's] reputation with HUD and their agents." (56.1 ¶59).

In deciding to terminate Plaintiff, Herman consulted with Uy. (56.1 ¶60). Neither Herman nor Uy solicited Russo's approval for the decision to terminate Plaintiff. (56.1 ¶61). Russo never expressed approval that Plaintiff should be terminated. (56.1 ¶62).

6

Herman and Uy met with Plaintiff on October 6, 2010 and notified her that her employment was terminated. (56.1 ¶63).

### D. Plaintiff's Post Termination Grievance

Plaintiff grieved her termination in accordance with GRCC's grievance procedure. (56.1 ¶64). Plaintiff's Step 1 and Step 2 grievances were denied by Herman and Uy respectively. (56.1 ¶¶65-66). In accordance with Step 3 of the grievance procedure, Plaintiff sought review of her termination by the Executive Committee of GRCC's Board of Directors. (56.1 ¶67). Plaintiff submitted a letter to the Executive Committee dated January 24, 2011 concerning her termination grievance in which she described the decision to terminate her as "draconian" and "unfair" - but not retaliatory. (56.1 ¶68). Consistent with Herman's conclusions regarding Plaintiff's performance, Plaintiff admits in her submission to the Executive Committee that she was responsible for the June 2009 "below average" HUD rating and that she did not always do her job "to the standard that others might wish from [her]." (56.1 ¶69). Plaintiff additionally acknowledged she hired a bed bug vendor "without adequate review of its cost or its past performance." Id. GRCC's Executive Committee denied Plaintiff's grievance. (56.1 ¶ 70).

### E. Plaintiff Files a Lawsuit Claiming Retaliation

Plaintiff alleges in her lawsuit that she was fired in retaliation for supporting Robles in his lawsuit and because she opposed housing discrimination at GRCC. *See* Complaint, *passim*.

At bottom, Plaintiff's retaliation claims are based purely on conclusory allegations and speculation and she cannot overcome the enormous gap (at least 16 months) between her protected activity and her termination.

## ARGUMENT

Plaintiff alleges GRCC retaliated against her for her participation in the Robles lawsuit in violation of Title VII of the Civil Rights Act, the New York State Human Rights Law

7

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), and for her opposition to housing discrimination between 2005 and 2009, in violation of the New York City Human Rights Law. To establish retaliation, Plaintiff must prove (1) that she was engaged in protected activity, (2) that GRCC was aware of that activity, (3) that she suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action. Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011). The essential elements of a retaliation claim under the NYSHRL and NYCHRL are the same as under Title VII. Sotomayor v. City of New York, 862 F. Supp. 2d 226, 261-62 (E.D.N.Y. 2012) (granting summary judgment on plaintiff's Title VII, NYSHRL, and NYCHRL claims because plaintiff could not establish a prima facie case of retaliation). Under the more liberal standard of the NYCHRL, Plaintiff does not need to show she suffered an adverse employment action, only that she suffered an action that would be "reasonably likely to deter a person from engaging in a protected activity…" Pilgrim v. McGraw-Hill Cos., 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009). Importantly, even under the NYCHRL, Plaintiff still must prove causation. Id.

## I.     ANY TITLE VII CLAIMS THAT ACCRUED MORE THAN 300 DAYS BEFORE THE FILING OF PLAINTIFF'S CHARGE OF DISCRIMINATION WITH THE EEOC ARE TIME BARRED

Plaintiff filed her unperfected charge of discrimination with the EEOC alleging retaliation on May 16, 2011. Any Title VII claims that accrued more than 300 days before this filing (before July 20, 2010) are time barred unless Plaintiff can establish a continuing violation. See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) ("discrete acts of discrimination or retaliation" that occur beyond the 300-day limitations period are time barred "even if other acts of discrimination occurred within the statutory time period"); Richardson v. City of New York, 285 F. Supp. 2d 303, 305 (E.D.N.Y. 2003) (holding that alleged retaliatory acts outside the 300 day limitation period are time-barred). Plaintiff cannot make this showing.

8

Accordingly, to the extent Plaintiff is alleging she suffered retaliatory acts leading up to her termination[4] that fall outside this 300 day limitations period (none of which amount to an adverse employment action anyway), such claims are time barred.

## II.     THERE IS NO CAUSAL CONNECTION BETWEEN PLAINTIFF'S SUPPORT OF ROBLES AND HER TERMINATION

To establish causation, Plaintiff must prove that "protected activity" was "a substantial motivating factor in the adverse employment action." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006). Without direct evidence of retaliation (as in our case), Plaintiff must establish causation "indirectly by showing [that the protected activity] was closely followed in time by the adverse employment decision." Id. at 168 (citing Gorman–Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001). "While there is no 'bright line' rule for cases that rely solely on temporal proximity, the protected activity and alleged discriminatory treatment must be 'very close[ly]' associated to support an inference of retaliation." Giles v. NBC Universal, Inc., No. 10 CV 7461 (DAB), 2011 U.S. Dist. LEXIS 106171, at *9-10 (S.D.N.Y. Sept. 20, 2011) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

Assuming all or most of Plaintiff's allegations are not time-barred, those that remain, if any, do not even come close to establishing causation based on temporal proximity. Plaintiff's participation in the Robles lawsuit amounts to helping Robles find an attorney in late 2007 or early 2008 following Robles' termination (56.1 ¶ 14), revising her statement given to the

---

[4] For example, the mundane, routine workplace irritants Plaintiff complains of - all of which occurred outside the 300 day limitations period (and are thus time barred) - such as being ignored at the 2009 annual meeting, feeling a "coldness" and a change in "atmosphere", being micromanaged, and the like, (Tiliakos Decl. Ex. A (Pl. Dep. 26:19-20, 45:16-18, 69:13-20, 96:14-17, 110:8-112:23); Compl. ¶¶ 27, 54, 55-62) do not amount to adverse employment actions. See Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 678 (S.D.N.Y. 2011).

investigator regarding the Robles lawsuit in July 2008 (56.1 ¶ 17), and providing deposition testimony in the Robles lawsuit in June 2009. (56.1 ¶ 19). Plaintiff's employment with GRCC was terminated on October 6, 2010, *sixteen months after* the last "protected activity" supporting her claim. It is well established that a sixteen month gap between a plaintiff's protected activity and the adverse action is insufficient to establish a causal connection. See Ragin v. East Ramapo Cent. Sch. Dist., 2010 U.S. Dist. LEXIS 32576, *83 (S.D.N.Y. Mar. 31, 2010) ("nearly six month gap between Plaintiff's protected activity and her termination defeats any inference of causation" where plaintiff offered no evidence of retaliatory animus); Giles, 2011 U.S. Dist. LEXIS 106171 at *11 ("Time periods as short as three months have been found to be too long to be considered causally connected, and periods over one year are generally conclusive that no retaliation has taken place."); McIntyre v. Longwood Cent. Sch. Dist., 380 F. Appx. 44, 47-48 (2d Cir. 2010) (plaintiff could not make *prima* facie showing of causation in support of retaliation claim where adverse action occurred over a year after protected activity); Caskey v. County of Ontario, 800 F. Supp. 2d 468, 472 (W.D.N.Y. 2011) ("nine month span of time between plaintiff's complaint and the alleged retaliatory conduct alleged here is patently insufficient to plausibly allege a causal connection by itself."). This sixteen month gap torpedoes Plaintiff's *prima facie* showing of causation. Summary judgment as to Plaintiff's retaliation claim should be granted based on these undisputed facts alone.

### III. PLAINTIFF WAS NOT RETALIATED AGAINST FOR OPPOSING HOUSING DISCRIMINATION

Plaintiff alleges that beginning in 2005 and ending in 2009, she opposed Russo's efforts to pass over Russian tenants in Phelps House. (56.1 ¶ 23). Plaintiff admits that she, not Russo, decided which prospective name was selected off the tenant waiting list. (56.1 ¶ 26). Neither of the decision-makers (Uy and Herman) instructed Plaintiff to pass over Russian applicants (56.1 ¶

10

34).[5] Russo never threatened to fire Plaintiff or question why she was not following his directive, even after she seemingly "disobeyed" him and selected Russian applicants (56.1 ¶¶29-30). Plaintiff did not consider Russo's alleged directive to be a threat and she ignored it without any repercussions (56.1 ¶31).

As above, it is well established that a plaintiff cannot make a *prima* facie showing of causation in support of a retaliation claim where the adverse action occurred over a year after the protected activity. See McIntyre, 380 F. Appx. at 47-48. Here, there is a five year gap between when Plaintiff claims she initially opposed Russo's alleged directive to pass over Russian tenants and when she was terminated. Even considering the last time Plaintiff alleges that Russo gave her this directive sometime in 2008 or 2009 (56.1 ¶28), there is still at least a one-year gap between the two events.

Finally, Plaintiff's retaliation claim for opposing housing discrimination is in direct conflict with her claim of retaliation for participation in the Robles lawsuit. Prior to her participation in the Robles lawsuit in late 2007 or early 2008, Plaintiff allegedly opposed housing discrimination since 2005, yet she also alleges that the "trouble began" when she "came to the defense" of Robles and after he was fired. (56.1 ¶20). This inherent inconsistency confirms there was no retaliation for opposing housing discrimination.

## IV.   PLAINTIFF'S SPECULATION DOOMS HER CLAIM

Plaintiff cannot escape summary judgment by presenting conclusory or speculative evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Conclusory allegations do not demonstrate a causal connection in a retaliation claim. Echenoza v. City of New York,

---

[5] In fact, Plaintiff testified that Herman told her to keep doing what she was doing and that Herman told Russo GRCC could not pass over Russian applicants without repercussion (Herman remains employed at GRCC). (56.1 ¶ 35; Complaint, ¶ 24).

1997 U.S. App. LEXIS 28452, at *5 (2d Cir. Oct. 9, 1997). Plaintiff relies entirely on conclusory allegations and speculation in arguing that her termination was related to her protected activity. She testified it was her "sense" and "hunch" that she was fired for retaliatory reasons (56.1 ¶ 71); and she "guesses" that her deposition in the Robles case was "seen as being disloyal" and not being a "Company team player" -- even though no one at GRCC told her as much. (56.1 ¶72). Plaintiff has no evidence that her participation in the Robles lawsuit or in opposing alleged housing discrimination had anything to do with her termination. Her speculation and conclusory allegations are not enough to bridge the considerable temporal gap between her protected activity and her termination. Summary judgment should be granted.

## V.     PLAINTIFF WAS TERMINATED FOR A LEGITIMATE NON-RETALIATORY REASON AND THERE IS NO PRETEXT

Even if Plaintiff can demonstrate a *prima facie* case of retaliation on either of her claims, this Court should reject Plaintiff's retaliation claims because she was lawfully terminated for a legitimate, non-retaliatory reason: her poor work performance that did not meet the expectations of her supervisors. See Cifra v. GE, 252 F.3d 205, 207 (2d Cir. 2001); Underkofler v. Cmty. Health Care Plan, Inc., No. 99-7838, 2000 U.S. App. LEXIS 19040 (2d Cir. Aug. 4, 2000); Feldman v. Looms, No. 98-9680, 1999 U.S. App. LEXIS 25092, at *5 (2d Cir. Oct. 4, 1999). Plaintiff was terminated because her new supervisors, Herman and Uy, evaluated her work product and determined she could not perform her job up to their standards. (56.1 ¶¶ 57-60). Importantly, Plaintiff acknowledges all the work issues that led Herman and Uy to terminate her employment, and ultimately that she was not meeting the expectations of her supervisors: she admits she was responsible for the June 2009 "below average" HUD rating, that she hired a bed bug vendor "without adequate review of its cost or its past performance," and that she did not always do her job "to the standard that others might wish from [her]." (56.1 ¶69).

While Plaintiff's disagreement and dissatisfaction with the termination is understandable, it is not enough to defeat summary judgment. See Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) (holding employee's disagreement with adverse employment action did not create material dispute of fact as to whether decision was discriminatory). The relevant inquiry is not whether Herman and Uy made the "right" decision but whether they legitimately believed in the reason for discharging Plaintiff. Ennis v. Sonitrol Mgmt. Corp., 2006 U.S. Dist. LEXIS 2599, at *50 (S.D.N.Y. Jan. 25, 2006) ("An employer need not be correct in his assessment of an employee's conduct to justify his discharge. All that is needed is legitimate belief that there is a reasonable basis for termination.") see also O'Sullivan v. New York Times, 37 F. Supp. 2d 307, 309 (S.D.N.Y. 1999)("[a]bsent a legally cognizable civil rights violation, the running of the affairs of a business entity is for management, not for disappointed employees or their counsel").

The admissible evidence establishes Plaintiff was terminated for legitimate, non-retaliatory reasons, and thus summary judgment should be granted.

## CONCLUSION

For the foregoing reasons, the Court should grant GRCC's motion for summary judgment, dismiss each of Plaintiff's claims, with prejudice, and grant such other relief as the Court may deem just and proper.

Dated: February 1, 2013
New York, New York

                              Respectfully submitted,

                              DUANE MORRIS LLP

                              By: _____
                              Michael Tiliakos
                              mtiliakos@duanemorris.com
                              Eric W. Ruden
                              eruden@duanemorris.com
                              1540 Broadway
                              New York, NY 10036-4086
                              Tel.: (212) 692-1000
                              Fax.: (212) 692-1020