UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN J. BALDWIN,

         Plaintiff,

         v.

GODDARD RIVERSIDE COMMUNITY
CENTER,

         Defendant.

11-CV-7591 (PGG)(HP)

---

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Civil Rule 56.1(a), Defendant Goddard Riverside Community Center

("GRCC"), by their attorneys Duane Morris LLP, submit this statement of material facts as to

which there is no genuine issue to be tried, in support of their motion, pursuant to Rule 56(b) of

the Federal Rules of Civil Procedure, for summary judgment dismissing the complaint of

Plaintiff Susan J. Baldwin ("Plaintiff") in its entirety.[1]

### A.    Background

1.     GRCC is a human service organization that operates five residence, including

Phelps House, an affordable housing building.  (Transcript of Deposition of Catherine Herman

("Herman Dep.") attached as Exhibit B to Tiliakos Decl. at 18:16-19:3; and Tiliakos Decl., Ex.

E.  (www.goddard.org/about-us/who-we-are/).

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record. Unless otherwise noted, copies of all deposition testimony and deposition exhibits are annexed to the accompanying Declaration of Michael Tiliakos, Esq., ("Tiliakos Decl.") dated February 1, 2013.

DM2\4031813.3

2.      Plaintiff was hired as Property Manager of GRCC's Phelps House in July 1994. (Transcript of Deposition of Plaintiff Susan J. Baldwin ("Pl. Dep."), attached as Exhibit A to Tiliakos Decl. at 15:6-13, 19:13-19).

3.      As a Property Manager, Plaintiff was responsible for, among other things, filing required certifications, including tenant income certifications and certifications of tax credits, with the United States Department of Housing and Urban Development ("HUD"). (Pl. Dep. 17:18-18:21, 174:24-175:8).

4.      Plaintiff had responsibilities for leasing. (Pl. Dep. 174:24-175:8).

5.      Plaintiff was also responsible for monitoring the physical state of Phelps House, supervising the superintendent and maintenance staff, and caring for the entire building, which besides apartments, also included the senior and the executive offices of GRCC. (Pl. Dep. 18:22-20:4).

6.      Salvador Uy ("Uy") was hired by GRCC in or around January 2008 as Associate Director for Operations. Uy was responsible for managing the fiscal office, overseeing housing with the Director of Housing, managing information technology and telecommunications, and handling human resources. (Transcript of Deposition of Salvador Uy ("Uy Dep."), attached as Exhibit C to Tiliakos Decl. at 12:4-16; Pl. Dep. 23:11-14).

7.      Catherine Herman ("Herman") was hired by GRCC on or about June 30, 2008 as Director of Housing. (Herman Dep. 17:12-19, 96:19-22).

8.      Herman was Plaintiff's director supervisor. (Herman Dep. 75:3-6).

9.      Stephan Russo ("Russo") first joined GRCC in 1976 and became Executive Director in December 1998. (Transcript of Deposition of Stephan Russo ("Russo Dep."), attached as Exhibit D to Tiliakos Decl. at 10:14-17, 13:16-19).

DM2\4031813.3

10.     As Executive Director, Russo is responsible for GRCC's operations.  He reports to the Board of Directors.  Russo supervises key staff, is responsible for the vision and direction of GRCC, and ensures that GRCC is well financed and well managed.  (Russo Dep. 10:14-13:19, 17:16-18:4).

11.     Jose Robles ("Robles") was a former Superintendent at Phelps House.  (Russo Dep. 41:14-22).

**B.      Plaintiff and the Robles Lawsuit**

12.     In October 2007, Russo terminated Robles.  (Pl. Dep. 23:23-24:2).

13.     Robles filed a grievance with GRCC challenging his termination and later filed a lawsuit alleging employment discrimination.  (Russo Dep. 41:14-48:22).

14.     Plaintiff helped Robles find an attorney in late 2007, early 2008 after he was terminated.  (Pl. Dep. 25:17-18).

15.     On July 22, 2008, Plaintiff was interviewed by an investigator from GRCC's insurance company regarding the Robles lawsuit.  (Pl. Dep. 57:23-58:10).

16.     Following this interview, the insurance investigator sent Plaintiff his draft of Plaintiff's statement. (Pl. Dep. 59:7-60:4).

17.     Plaintiff sent the insurance company (not GRCC) corrections to her statement. (Pl. Dep. 57:8-22, 61:1-5; Plaintiff's Revised Statement, attached as Exhibit F to Tiliakos Decl.).

18.     No one at GRCC ever brought up the issue of her statement to the insurance company to Plaintiff during her employment at GRCC.  (Pl. Dep. 61:2-21, 63:6-12, 70:8-25, 78:10-17).

19.     Plaintiff was deposed in the Robles lawsuit on June 22, 2009.  (Pl. Dep. 44:11-20).

DM2\4031813.3

20.     Plaintiff believes the "trouble began" for her when she "came to the defense" of Robles and after he was fired. (Pl. Dep. 25:17-21, 355:8-356:4).

21.     Russo never asked Plaintiff about her alleged support of Robles or otherwise raised the topic of her alleged support of Robles with her.  (Pl. Dep. 47:3-11).

22.     Neither Uy, Herman nor anyone else in GRCC management ever discussed Plaintiff's support of Robles with her.  (Pl. Dep. 47:12-20, 56:2-6, 79:4-11).

**C.     Plaintiff Claims Opposition to Housing Discrimination Between 2005 and 2009**

23.     Sometime beginning in 2005 and ending in 2009, Russo told Plaintiff to pass over Russian applicants seeking tenancy at Phelps House. (Pl. Dep. 291:20-292:21, 300:14-20, 308:4-309:13).

24.     GRCC has an established Equal Employment Opportunity policy that prohibits retaliation and contains a complaint procedure.  (Statement of Personnel Policies, attached as Exhibit G to Tiliakos Decl.).

25.     Plaintiff did not complain to HUD or any other agency about Russo's alleged directive to pass over prospective Russian tenants (Pl. Dep. 321:21-25).

26.     As Property Manager, Plaintiff did not have to seek to approval from Russo or anyone else when filling tenant vacancies, as it was her decision (in accordance with HUD regulations) which prospective tenant was selected from the waiting list. (Pl. Dep. 297:22-23, 298:2-4).

27.     Plaintiff informed Russo that she could not pass over prospective Russian tenants because there was an "open list" and because she had to follow HUD regulations. (Pl. Dep. 298:15-19).

DM2\4031813.3

28.     Between 2005 and 2009 (when Plaintiff was terminated), Russo allegedly instructed Plaintiff on six occasions to pass over Russian applicants, with the last time being "in 2008 or 2009." (Pl. Dep. 309:4-13).

29.     Russo never approached Plaintiff to discuss the Russian applicants that were selected, nor did he question why she was not following his directive to pass over prospective Russian tenants.  (Pl. Dep. 302:11-18, 310:24-311:5).

30.     Russo never threatened to fire Plaintiff or cut her pay if she did not keep Russian tenants out of Phelps House, nor was her pay or vacation ever docked.  (Pl. Dep. 301:2-8, 353:15-24).

31.     Plaintiff did not interpret Russo's directive to pass over Russian applicants as a threat. (Pl. Dep. 320:17-23).

32.     Plaintiff ignored Russo's "directive" to pass over Russian applicants. (Pl. Dep. 320:24-321:2, 303:11-16).

33.     Plaintiff selected at least five Russian prospective tenants after Russo instructed her to pass over prospective Russian tenants.  (Pl. Dep. 301:24-302:10, 303:11-16).

34.     Neither Herman nor Uy ever instructed Plaintiff to pass over Russian applicants. (Pl. Dep. 346:21-347:5).

35.     Herman told Plaintiff to continue doing what she was doing (Pl. Dep. 349:5-10).

**D.      Plaintiff's Performance Issues and Her Failure to Meet Her New Supervisor's Expectations**

36.     When Herman first started at GRCC in June 2008, her first impression of Plaintiff was that her "office was disorganized." (Herman Dep. 74:7-12).

37.     Herman saw that Plaintiff's files (including tenant files) and her desk were in a chaotic state. (Herman Dep. 119:4-12; September 13, 2010 Memorandum prepared by Herman attached as Exhibit G to Tiliakos Decl.).

38.     This disorganization concerned Herman because even if Plaintiff's certification calculations were done correctly, they could be obscured by the fact that her files were so disorganized.  (Tiliakos Decl., Ex. G (9/13/10 memo) ("I was concerned enough about the chaotic state of Susan's files and desk that I discussed purchasing a rolling cart so she could be better organized...she continues to have mounds of loose unfiled papers over the entire surface of her desk and floor with very little evidence of organization"); April 30, 2010 email from Herman to Plaintiff, attached as Exhibit I to Tiliakos Decl.)("I really need to insist that you try out that mobile filing cart (legal size) for you in the hopes it enables you to develop a better system for all the paperwork you have to keep track of...mastering the paperwork requires creating order out of chaos and [] to do this you absolutely have to change your habits...I really think it is inefficient at best").

39.     On January 1, 2009, Grenadier replaced T.U.C. Management as GRCC's third party management company.  (Pl. Dep. 119:2-9).

40.     Plaintiff continued to use the old property management system.  (Pl. Dep. 180:12-18).

41.     Herman concluded that Plaintiff refused to exclusively use Grenadier's property management system and that she was undermining the transition from T.U.C. Management to Grenadier.  (Herman Dep. 131:5-13, 144:18-19, 160:9-161:8, 180:12-181:19; Herman's February 18, 2009 memorandum attached as Exhibit J to Tiliakos Decl.; Email from Herman to Plaintiff dated February 12, 2009, attached as Exhibit K to the Tiliakos Decl.) ("You're

dissipating your time and energy by focusing on every opportunity to find fault with Grenadier rather trying to work with them"); March 16, 2010 Email from Herman to Plaintiff , attached as Exhibit K to Tiliakos Decl., ("Objectively speaking, the job is not so overwhelming but it requires that you just put aside your negative feelings about the software, anything to do with the Tax Credit Program, Grenadier's competency, etc. etc. From my point of view, completing these [tenant income certifications] is reminiscent of the long standing situation with the Tax Credit files that have been going on for some time when I started working here. You resisted completing the annual recertifications for well over a year for any number of reasons that you recounted numerous times").

42.     On or about February 18, 2009, Plaintiff and Herman discussed, among other things, Grenadier's property management system. (Pl. Dep. 133:10-135:20).

43.     Plaintiff admits that she was "on the shrill side" with Herman during their February 18, 2009 discussion and that she upset Herman. (Pl. Dep. 135:14-23).

44.     Herman prepared a summary of this discussion and sent Plaintiff an email on February 20, 2009, with the subject heading "Summary of our meeting," in which Herman expressed her dissatisfaction with Rankin's focus and reminded Plaintiff that "the buck stops with you, then with me, and right now it doesn't look good." (February 20, 2009 email from Herman to Plaintiff, attached as Exhibit M to Tiliakos Decl.; Herman Dep. 131:5-132:11).

45.     In or around June 2009, Phelps House received an overall rating of "below average" and a rating of "below average in leasing and occupancy" from HUD. (Pl. Dep. 168:2-21; Herman Dep. 145:11-13).

46.     Plaintiff acknowledges the HUD files were "out of place" in 2009. (Pl. Dep. 169:16-21) and that she was responsible for the rating. (Tiliakos Decl., Ex. G (9/13/10 memo)

("True it is that the HUD contract administrator's 2009 management review found Phelps House below average.  The findings behind this outcome were minor and technical but were numerous to the point that the rating was inevitable.  And I was responsible for it").

47.     Herman arranged for a Grenadier employee to assist Plaintiff with the June 2010 HUD audit. (Pl. Dep. 173:16-20; Herman Dep. 144:18-145:6; Tiliakos Decl., Ex. G (9/13/10 memo)).

48.     Phelps House received an "above average" rating in the June 2010 HUD audit. (Pl. Dep. 172:25-173:9; Herman Dep. 145:3-6; Tiliakos Decl., Ex. G (9/13/10 memo)).

49.     Herman attributed the improvement in the score "pretty much" entirely to Grenadier's efforts.  (Herman Dep. 145:7-10).

50.     In the summer of 2010, Phelps House had a bed bug issue.  (Pl. Dep. 184:18-23).

51.     To address and remedy the problem, Herman recommended a vendor (Tri State Cleaning) to Plaintiff.  (Pl. Dep. 187:4-16; Herman Dep. 135:17-137:10).

52.     Plaintiff did not select this vendor.  (Pl. Dep. 187:4-16; Herman Dep. 137:11-15).

53.     Plaintiff instead chose "Prep for Bed Bugs" to remedy the bed bug issue.  (Pl. Dep. 185:25-186:5).

54.     Plaintiff acknowledges "they were not the right selection…"  (Pl. Dep. 186:22-187:3; Tiliakos Decl., Ex. G (9/13/10 memo)("…I acknowledge that last summer I hired a company, without adequate review of its cost or its past performance, to handle the preparation of tenants' apartments for bed bug treatment.  I did not bring its representatives to the August 12 staff meeting to discuss the problem, and was on vacation in September when the company performed poorly in its one assignment in a tenant's apartment").

55.     Plaintiff never received a written proposal or estimate from "Prep for Bed Bugs" before selecting them.  (Pl. Dep. 189:12-16).

56.     Ultimately, due to difficulties with "Prep for Bed Bugs", Tri State Cleaning was used to remedy the bed bug issues at Phelps House. (Pl. Dep. 192:6-14).

57.     Between the summer of 2010 and September 13, 2010, Herman concluded that Plaintiff was unable to carry out her duties and responsibilities as Property Manager of Phelps House and should be terminated (Herman Dep. 129:21-23; Tiliakos Decl., Ex. G (9/13/10 memo)).

58.     Herman concluded that Plaintiff expressed a negative attitude about GRCC and Grenadier that created a toxic atmosphere, and that she was deficient in:  supervising staff and allocating work; her familiarity with the condition of Phelps House on a daily basis; completing tax credit files; and adjusting to Grenadier. (Tiliakos Decl., Ex. G (9/13/10 memo)).

59.     Herman also concluded that Plaintiff lacked the competency in handling tenant certifications and re-certifications for HUD Section 8 subsidies and that Plaintiff's failure to accept constructive criticism had "reached the point of being detrimental to [GRCC's] reputation with HUD and their agents." (Tiliakos Decl., Ex. G (9/13/10 memo)).

60.     In deciding to terminate Plaintiff, Herman consulted with Uy.  (Herman Dep. 151:14-25).

61.     Uy did not solicit Russo's approval for the decision to terminate Plaintiff.  (Russo Dep. 69:10-70:16; Uy Dep. 52:12-18).

62.     Russo never expressed approval that Plaintiff should be terminated.  (Russo Dep. 69:10-70:16; Uy Dep. 52:12-18; Pl. Dep. 196:5-11).

DM2\4031813.3

63.     Herman and Uy met with Plaintiff on October 6, 2010 and notified her that her employment was terminated.  (Pl. Dep. 193:24-194:11).

**F.     Plaintiff Makes A Post-Termination Grievance Pursuant to GRCC's Statement of Personnel Policies**

64.     Following her termination, Plaintiff grieved her termination in accordance with GRCC's grievance procedure.  (Pl. Dep. 20:17-21:11, 198:11-19; Tiliakos Decl., Ex. G (Personnel Practices) and October 18, 2010 letter, attached as Exhibit N to Tiliakos Decl.).

65.     Plaintiff's Step 1 Grievance was denied by Herman.  (November 23, 2010 letter, attached as Exhibit O to Tiliakos Decl.).

66.     In accordance with Step 2, Plaintiff met with Uy to discuss her grievance on December 15, 2010.  Uy denied Plaintiff's grievance.  (December 21, 2010 letter, attached as Exhibit P to Tiliakos Decl.).

67.     In accordance with Step 3 of the grievance procedure, Plaintiff sought review of her termination by the Executive Committee of GRCC's Board of Directors.  (December 28, 2010 letter, attached as Exhibit Q to Tiliakos Decl.).

68.     Plaintiff submitted a letter to the Executive Committee dated January 24, 2011 concerning her termination grievance.  In this letter, Plaintiff described the decision to terminate her as "draconian" and "unfair."  (January 24, 2011 letter, attached as Exhibit R to Tiliakos Decl.).

69.     Plaintiff admits in her January 24, 2011 letter to the Executive Committee that: she was responsible for the June 2009 "below average" HUD rating, ("The findings behind this outcome were minor and technical but were numerous to the point that the rating was inevitable. And I was responsible for it"), that she did not always do her job "to the standard that others

might wish from [her]", and that she hired a bed bug vendor "without adequate review of its cost or its past performance." (Tiliakos Decl., Ex. R (Plaintiff's submission to Step 3)).

70.    GRCC's Executive Committee denied Plaintiff's grievance. (Pl. Dep. 221:18-225:24).

71.    Plaintiff's "sense" and her "hunch" is that she was terminated for retaliatory reasons. (Pl. Dep. 106:22-107:2, 110:19-111:17) ("I really felt – I mean, in looking back, since I was fired, I, you know, I – that's my sense that it was retaliation…in looking back, when I brought my lawsuit, I really felt – I feel that I am on the right track with that speculation"), and 196:5-14 ("…its my hunch" that retaliation from her involvement in the Robles case was part of the decision to terminate her employment).

72.    Plaintiff "guesses" her deposition in the Robles case was "seen as being disloyal" and not a "Company team player" even though no one at GRCC told her she was disloyal or not a team player (Pl. Dep. 45:19-46:5, 46:16-20, 82:6-22, 83:2-5).

73.    Plaintiff herself did not believe she had been subjected to retaliation until after she was terminated (Pl. Dep. 83:17-84:3).

Dated: February 1, 2013

New York, New York

DUANE MORRIS LLP

By: _____

Michael Tiliakos
mtiliakos@duanemorris.com
Eric W. Ruden
eruden@duanemorris.com
1540 Broadway
New York, NY 10036-4086
Tel.: (212) 692-1000
Fax.: (212) 692-1020