UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/29/14__
```

SUSAN J. BALDWIN,

                    Plaintiff,

        - against -

GODDARD RIVERSIDE COMMUNITY
CENTER,
                    Defendant.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 7591 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Susan Baldwin alleges that her former employer, Defendant Goddard

Riverside Community Center ("Goddard"), retaliated against her for opposing unlawful housing

discrimination and unlawful employment discrimination in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (Am. Cmplt. (Dkt. No. 23))  Baldwin

claims that she was harassed and ultimately terminated by Goddard because (1) she opposed a

supervisor's instruction to deny tenancy to Russian applicants who applied for vacancies in the

affordable housing building she managed; and (2) she supported a former co-worker in his

lawsuit against Goddard for discriminatory termination by, inter alia, helping the co-worker find

an attorney, giving a favorable report about his work performance to Goddard's insurance

company, and testifying at a deposition on his behalf.  Defendant has moved for summary

judgment on all claims. (Dkt. No. 30)  For the reasons stated below, Defendant's motion will be

granted.

## BACKGROUND[1]

### I.      PLAINTIFF'S EMPLOYMENT AT GODDARD

Goddard Riverside Community Center is a social service organization that operates five residential buildings in New York City.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 1)  One of these residences is Phelps House, an affordable housing building.  (Id.)

Plaintiff Baldwin was hired as Property Manager of Phelps House in July 1994.  (Id. ¶ 2)  As Property Manager, her job responsibilities included handling leasing matters, monitoring the physical state of the building, and supervising the superintendent and maintenance staff.  (Id. ¶¶ 4-5)  She was also responsible for filing required certifications with the United States Department of Housing and Urban Development ("HUD"), including tenant income and tax credit certifications.  (Id. ¶ 3)

Mercedes Rankin was hired as Baldwin's Administrative Assistant in 1994.  (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 1)  Rankin remained at Goddard throughout Baldwin's tenure, and later became Assistant Building Manager.  (Id.)  Rankin worked closely with Baldwin at Phelps House, and the two shared office space or were in adjacent offices throughout the time they worked together.  (Id. ¶ 2)

In December 1998, Stephan Russo became Executive Director of Goddard.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 9)  Russo had been employed at Goddard since 1976.  (Id. ¶ 9)  As Executive Director, Russo – who still holds the position – oversees Goddard's operations.  (Id. ¶ 10)  His responsibilities include supervising staff members and ensuring that

---

[1]  Unless otherwise indicated, this Court cites to facts drawn from a party's Local Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence.  See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

Goddard is well-financed and well-managed. (Id.) He is also "responsible for [Goddard's] vision and direction." (Id.)

Baldwin states that she had a "positive relationship" with Russo when he first became Executive Director. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 5) Baldwin was also well-liked by Phelps House tenants and by Gerald Mascuch, her direct supervisor at the time. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 76) There is no evidence of documented criticism of Baldwin's job performance through the early 2000s. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶¶ 6-7; see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 76) From 1994 to 2008, Phelps House received a "satisfactory"; "above average"; or "excellent" rating from HUD each year. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 75)

In January 2008, Goddard hired Salvador Uy as Associate Director for Operations. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 6) His responsibilities included managing the fiscal office, managing information technology and communications, and handling human resources. (Id.) Together with Goddard's Director of Housing – Baldwin's direct supervisor – Uy also oversaw housing matters. (Id. ¶¶ 6-8)

On June 30, 2008, Goddard hired Catherine Herman as Director of Housing. (Id. ¶ 7) Baldwin initially had a positive relationship with Herman. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 79) Herman respected Baldwin's HUD expertise, deferred to her years of experience, and "treated her with dignity." (Id.) Baldwin states that Herman did not "make any [negative] comments" to Baldwin about the organization of Baldwin's office at the beginning of Herman's tenure. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 16)

## II.   PLAINTIFF'S ALLEGED OBJECTIONS TO HOUSING DISCRIMINATION

As Property Manager, Baldwin was responsible for filling tenant vacancies in Phelps House. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 4-5, 26)  Baldwin had discretion to choose which prospective tenant or tenants to select from the waiting list for Phelps House, provided her selection was made in accordance with HUD regulations. (Id. ¶ 26)

Beginning in 2005, however, Russo repeatedly advised Baldwin to "pass over" Russian applicants seeking an apartment at Phelps House, in favor of applicants of other ethnicities. (See id. ¶ 23)  Baldwin told Russo that she could not deny applicants housing based on their ethnicity, because doing so would violate HUD regulations. (See id. ¶ 27)  Russo nonetheless repeated this instruction to Baldwin on six occasions between 2005 and 2009. (Id. ¶ 28)  Baldwin disregarded Russo's instruction and selected at least five Russian tenants during the period between 2005 and 2009. (Id. ¶¶ 32-33)

Russo never chastised Baldwin about her selection of Russian applicants. (Id. ¶ 29)  On one occasion in 2007, however, Russo told Baldwin that if anyone questioned her about not accepting Russian applicants, she could "blame it" on him. (Bernstein Affirm. (Dkt. No. 42), Ex. 6 ("Pltf. Dep. Tr.") at 299)  Russo never threatened to fire Baldwin or to reduce her pay if she selected Russian tenants for Phelps House, nor was her pay or vacation time ever docked for doing so. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 30)  Moreover, Baldwin did not complain to HUD or to any other government agency about Russo's alleged instructions to pass over Russian applicants. (See id. ¶ 25)

Baldwin and Rankin, Baldwin's administrative assistant, say that in late fall 2008 they discussed Russo's instructions regarding Russian applicants with Housing Director Herman. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 17; id., Ex. 4 ("Rankin Aff.") ¶ 8)

Herman then discussed the issue with Russo, and told him that passing over Russian applicants would be illegal. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 81) Rankin claims that Herman said that she had spoken to both Russo and Uy about the issue and told them that "while [Herman] was there, [Baldwin and Rankin] should take whoever was at the top of the [waiting] list." (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 11) Herman also told Baldwin "to continue doing what she was doing." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 35) Neither Herman nor Uy ever instructed Baldwin to pass over Russian applicants. (Id. ¶ 34)

Rankin claims that Russo continued to question her about the ethnicities of incoming tenants, even after his conversation with Herman. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 12) She also states that most applicants accepted into Phelps House at about that time were Russian. (Id.)

## IV.   PLAINTIFF'S SUPPORT OF JOSE ROBLES

Baldwin claims that in late 2007 Russo called a meeting of Phelps House staff to discuss the disappearance of some liquor that had been stored in a basement room of the building. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 9; see Bernstein Affirm. (Dkt. No. 42), Ex. 7) According to Baldwin, Russo blamed Jose Robles – the superintendent of Phelps House at that time (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 11) – for the missing alcohol. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 9) Baldwin – who supervised Robles – believed that he was an excellent employee and that there was no evidence that he had stolen the liquor. (Id. ¶ 10)

In October 2007, Russo terminated Robles's employment. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) at 12) According to Baldwin, she was not consulted about the decision to fire Robles, even though he reported to her. (Bernstein Affirm. (Dkt. No. 42), Ex. 6 ("Pltf.

5

Dep. Tr.") at 27)  Robles filed an internal grievance with Goddard challenging his termination, alleging that it was the product of illegal discrimination.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 13)

Baldwin complained about Robles's termination to Jerry Mishue – one of her immediate supervisors – and to Brad Winston, Goddard's representative at its third party management company.  (Bernstein Affirm. (Dkt. No. 42), Ex. 6 ("Pltf. Dep. Tr.") at 27-28, 39-40)  Baldwin told both Mishue and Winston that she believed that Robles's termination was the result of discrimination.  (Id. at 35, 37, 43)  Baldwin "felt that it was an unfair firing and [she] helped [Robles] as best [she] could."  (Id. at 28)

In or about November 2007 – about a month after Robles was fired – Baldwin was summoned to meet with Eric Rosenfeld, a member of Goddard's Board of Directors.  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 11)  Rosenfeld allegedly made "derogatory comments" about Robles and asked Baldwin for her "write-ups" on Robles.  (Id.)  Baldwin responded that she did not have any "write-ups" for Robles, and sarcastically asked, "[S]hould I?"  (Id.)

Robles eventually decided to sue Goddard, and in late 2007 or early 2008 Baldwin helped Robles find an attorney.  (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 13-14)  On May 23, 2008, Robles filed an employment discrimination lawsuit against Goddard.  (Id. ¶ 13; see Robles v. Goddard Riverside Cmty. Ctr., Inc., No. 08 Civ. 4856 (LTS) (JCF) (S.D.N.Y.))

On July 22, 2008, an investigator from Goddard's insurance company interviewed Baldwin about the Robles lawsuit.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 15)  The investigator later sent Baldwin a memorandum purporting to summarize the interview.  (Id. ¶ 16)

6

Baldwin claims that the investigator had "distort[ed]" her remarks to "reflect[ ] poorly on Mr. Robles and therefore help Goddard in its defense of the lawsuit." (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶¶ 12-13) Baldwin sent the insurance company a list of revisions, but did not provide her revisions to Goddard. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 17; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 89; Bernstein Affirm. (Dkt. No. 42), Ex. 7) Baldwin also told several co-workers that the investigator had distorted her remarks. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 14)

On June 22, 2009, Robles's lawyer took Baldwin's deposition. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 19) According to Baldwin, Goddard's attorney told her before the deposition that he would not be representing her. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 21) Baldwin also claims that the attorney "acted with aggressive body language," which she believed was meant to intimidate her. (Id.)

At the deposition, Baldwin produced a copy of her revisions to the insurance investigator's account of her interview, and this document was marked as an exhibit to the deposition. (Id. ¶ 22) Baldwin also testified that she had not been consulted about Robles's termination, that Russo "had a pattern of getting rid of older employees," and that she had helped Robles find his lawyer (Id.)

Russo, Uy, and Herman never discussed Baldwin's support of Robles with her. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 21-22)

## IV.   ALLEGED RETALIATION AGAINST BALDWIN

Baldwin claims that her supervisors at Goddard retaliated against her because of her opposition to "passing over" Russian applicants and her support of Robles. (Am. Cmplt. (Dkt. No. 23) ¶ 1) Baldwin states that in late 2008 she "felt the atmosphere begin to change in

7

terms of how [her] superiors were treating [her]." (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19)

Prior to January 2009, Goddard had been using a third party management company – T.U.C. Management – to assist in providing services to Phelps House tenants. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 39) Beginning on January 1, 2009, a new management company – Grenadier – was scheduled to replace T.U.C. at Phelps House. (Id.)

According to Baldwin and Rankin, Housing Director Herman had assured Baldwin that she would not bring Grenadier staff into Phelps House without Baldwin being present. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 16; Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19) In December 2008, however – while Baldwin was on leave – Rankin observed Herman bring Grenadier staff into Phelps House, log them into Baldwin's computer, and assist them in examining Baldwin's hard copy files. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 17) Rankin reported this incident to Baldwin. (Id. ¶ 18; Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19) Baldwin alleges that this incident marks Goddard's first act of retaliation against her. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19)

After Grenadier replaced T.U.C. Management in January 2009, Housing Director Herman and Baldwin began to disagree about the utility of Grenadier's new property management system. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 41-44) Baldwin continued to access the old computer system, which she claimed was necessary to retrieve information that had not been properly transitioned to Grenadier's system. (See Tiliakos Decl. (Dkt. No. 33), Ex. A ("Pltf. Dep. Tr.") at 133-37) Herman testified that she believed Baldwin was undermining the transition to Grenadier, and their disagreements about Grenadier's role

8

going forward is evident from contemporaneous email.  (See Tiliakos Decl. (Dkt. No. 33), Ex. B

("Herman Dep. Tr.") at 131-32; Bernstein Affirm. (Dkt. No. 42), Ex. 18 (Feb. 10, 2009 Herman

email to Baldwin); id., Ex. 19 (March 25, 2009 Herman email to Baldwin))

On February 18, 2009, Herman and Baldwin discussed Grenadier's new property

management system.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 42)  Baldwin

acknowledges that she was "on the shrill side" with Herman at this meeting.  (Id. ¶ 43)  On

February 19, 2009, Herman prepared a memorandum summarizing her February 18, 2009

meeting with Baldwin.[2]  (Id. ¶ 44; Tiliakos Decl. (Dkt. No. 33), Ex. J)  In her summary, which is

written in the form of a communication to Baldwin, Herman states:

---

[2]  The Court discusses excerpts from Herman's February 19, 2009 meeting summary, but the
entire memorandum is set forth below:

> February 19, 2009          Summary of Meeting on 2/18/09
>
> I wanted to write this summary of our meeting for us to have as a record of the
> issues we discussed and the accord we reached.
>
> I had been taken aback by your phone call telling me that you "refused" to use the
> new property management system.  I found your reaction to be so provocative
> that, as I told you yesterday, I actually thought you were asking to be fired as a
> way out of a job that had become too stressful for you.  You must understand that
> it is difficult to be on the receiving end of this kind of aggression and
> insubordination.
>
> You stated during our meeting that you really did want to keep your job and that a
> series of stressful events both inside and outside of work caused you to boil over
> and that you apologized for being overwrought, I appreciate the context for your
> overreaction; however, I've heard some of this anger and frustration before.
>
> To be concrete: You've complained since I started working with you about having
> to work until 8 o'clock at night to get all your work done – all the more reason to
> let old grievances go and transfer as much to Grenadier and our new systems as
> possible so you can increase efficiency.  (By the way, no one expects you to work
> that late on a regular basis.)

You've complained that Grenadier's forms are faded and that they are rigid on the subject, but in fact they're very flexible. If, as you've pointed out, they've spelled some names incorrectly, or made a mistake on a tenant's rent, let's just get them the corrections and move on.

I felt you were undermining the transition to the new property management company, but you countered that you were just frustrated by losing important information on file in the (now) former software system and by the tone of one of the Grenadier employees. During our discussion it emerged that being closed out of HUD Manager may have had little or nothing to do with Grenadier. You also added that working with Paulette Holiday has been positive. I offered to get the other side of the story as to what possible reason there may have been for a Grenadier employee to recertify a tenant (and incompletely at that) rather than by you or Mercedes as it should have been done.

Grenadier was selected because it was felt that they could help to strengthen our property management acumen and enable us to be more efficient. For example, you and Mercedes have fallen behind in Section 42 LIHTC compliance, apartment rentals and some physical plant issues. (I'm attaching Jeff Goldstein's July 7, 2008 letter on the urgency of completing our LIHTC files that I don't think we ever showed you in a misguided attempt to shield you.) You agreed that you would work with Grenadier's considerable resources and ask for their support to help you catch up with our pressing compliance issues.

We agreed that it was unfortunate that TUC dragged their feet for the last year on installing One Site, but now we're so behind we'll continue to do the recerts manually and try to get a waiver. Our follow up meeting on the 19th was not reassuring – the sole purpose was to go over Mercedes' To Do list tenant by tenant. She didn't know where her old list was, had not made a new one and was watching the show "Countdown" on her computer when I walked in! This cast a lot of doubt on the claim that there is too much work to do! I found this rather shocking. When we were working with Claire late summer or early fall I had approved both of you working flexible hours in order to have more quiet time – but I sense little progress has been made on the task in the last five months. I'll set a date two weeks from now for our first internal file audit.

I hope you feel that I've been inclusive and supportive in the short time we've worked together, and if there are other ways in which I can be supportive, please let me know. If you harbor resentment because of conflicts from years ago, I can't change the past – but I urge you to work on letting it go. Your job is to see that we are full compliance in all areas – it's a tall order. Let me know if you feel you are not up to it. –Cathy

(Tiliakos Decl. (Dkt. No. 33), Ex. J)

10

I had been taken aback by your phone call telling me that you "refused" to use the new property management system. I found your reaction to be so provocative that, as I told you yesterday, I actually thought you were asking to be fired as a way out of a job that had become too stressful for you. You must understand that it is difficult to be on the receiving end of this kind of aggression and insubordination.

(Tiliakos Decl. (Dkt. No. 33), Ex. J) In addition to complaining that Baldwin was "undermining the transition to the new property management system," Herman also notes that a "follow-up meeting" she had with Baldwin and Rankin on February 19, 2009, "to go over [Rankin's] To Do list tenant by tenant" "was not reassuring," given that no "to do" list had been prepared for the meeting and Rankin – who was supervised by Baldwin – was watching a TV show on her computer when Herman arrived for the meeting.[3] (Id.)

Uy – Herman's supervisor – testified that he spoke with Herman and Russo about terminating Baldwin on February 20, 2009. (Bernstein Affirm. (Dkt. No. 42), Ex. 13 ("Uy Dep. Tr.") at 52, 57) According to Uy, Herman stated that she intended to "write up" Baldwin for her performance deficiencies, and indicated that – if Baldwin's work performance did not improve – she would move to terminate Baldwin's employment. (Id. at 57) In response to Herman's statement that it might be necessary to terminate Baldwin's employment, Uy responded, "[l]et's . . . talk about what that would take." (Id. at 58) In a February 22, 2009 email to Russo and Rosenfeld, Uy states that, "in [his] opinion, [he and Herman are] going to be moving Susan [i.e., terminating Baldwin's employment] sooner or later." (Bernstein Affirm. (Dkt. No. 42), Ex. 14; id., Ex. 13 ("Uy Dep. Tr.") at 60-61)

---

[3] In a February 20, 2009 email to Baldwin, Herman states that she is "attaching [her] notes from our meetings on [February 18 and 19, 2009]. You, of course, are free to respond if you wish." (Tiliakos Decl. (Dkt. 33) Ex. M) Baldwin responds to the email but does not reference the notes. (Id.) Baldwin now claims that the notes were not attached to Herman's email and that she did not receive Herman's summary of their February 18, 2009 meeting until after she was fired on October 6, 2010. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 44)

Herman also testified that she and Uy had discussed Baldwin's performance deficiencies in February 2009. (Tiliakos Decl. (Dkt. No. 33), Ex. B ("Herman Dep. Tr.") at 127-28) According to Herman, she had concluded at that time that Baldwin's performance deficiencies warranted her termination. (Id. at 127) She did not recommend Baldwin's termination at that time, however, but instead confronted Baldwin and asked her whether she was "up to doing th[e] job" and if she "want[ed] to keep th[e] job." (Id. at 129) Baldwin responded that she wanted to keep the job. (Id.)

According to Baldwin, at about this time Herman began transferring Baldwin's duties to Grenadier. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 20) Baldwin confronted Herman about this development in early 2009 and "was able to preserve [her] essential functions" at that time. (Id.) Rankin confirms that "Herman was pressing to transfer some of Mrs. Baldwin's duties to Grenadier," and that "Baldwin fought to keep the functions she had previously been responsible for." (Id., Ex. 4 ("Rankin Aff.") ¶ 20) Baldwin claims that by spring 2009, Grenadier and Herman had started contracting third party vendors to perform work at Phelps House without notifying Baldwin in advance. (Id., Ex. 8 ("Pltf. Aff.") ¶ 20)

In spring 2009, Russo "gave Mrs. Baldwin the cold shoulder at an annual directors meeting" and introduced another Phelps House employee – Doris Colon, the Director of Social Services – as the building manager, instead of Baldwin. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 23)

In June 2009, HUD audited Phelps House. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 45) In a June 15, 2009 report, HUD gave Phelps House an overall rating of "below average" and a rating of "below average in leasing and occupancy." (Id.; Bernstein Affirm. (Dkt. No. 42), Ex. 10) Phelps House had never before received a less than "satisfactory"

12

rating during Baldwin's tenure as Property Manager.  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 75)

Baldwin claims that the poor ratings were the result of (1) Grenadier staff misplacing Phelps House files, and (2) Herman's refusal to permit Baldwin to hire a vendor to fix sprinklers that had been painted over.  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶¶ 28-30)  Rankin likewise states that Grenadier staff "was more of a detriment than an asset" in preparing for the audit and "threw out certain required documentation, which resulted in points being docked on the June 2009 review."  (Id., Ex. 4 ("Rankin Aff.") ¶ 29)  Housing Director Herman attributed the poor ratings to Baldwin's poor file maintenance, however.  (Id., Ex. 3 ("Herman Dep. Tr.") at 146-47)

Baldwin claims that she asked Herman for permission to challenge several of HUD's findings, but Herman stated that Grenadier would handle the matter.  (Id., Ex. 8 ("Pltf. Aff.") ¶ 31; see id., Ex. 3 ("Herman Dep. Tr.") at 147-48)  According to Baldwin, Grenadier never did.  (Id., Ex. 8 ("Pltf. Aff.") ¶ 33)

On June 22, 2009, Robles's attorney took Baldwin's deposition.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 19)  After the deposition, Russo "ostracized [Baldwin] completely"; "stopped calling [her] and coming by [her] office"; "went out of his way to avoid [her]"; "started using Doris Colon and other staff as . . . intermediar[ies] [to speak to her]"; "confine[d] his regular site visits to the social services office, instead of as before coming to the management office"; "ignore[d] her" and only spoke to Rankin; and "stopped acknowledging her entirely at monthly directors meetings, whereas before [her] deposition he would look to [her] for support when he was speaking at these meetings."  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 23)  Rankin confirms that "Russo went out of his way to avoid even speaking to

13

Mrs. Baldwin" and would sit in Rankin's office "with his back facing Mrs. Baldwin's office."

(Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 26)

After Baldwin's deposition, Herman also "started treating [Baldwin] . . . in an

abusive manner." (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 24) Baldwin alleges

that Herman,

> [w]ith increasing frequency[,] . . . would raise her voice and adopt a scolding tone
> or condescending manner in conversation. She started micromanaging [Baldwin]
> whereas before she had deferred to [Baldwin's] expertise[.] She continuously
> chastised [Baldwin] for problems that were not [Baldwin's] fault: for example,
> criticizing [her] for not getting paperwork to Grenadier fast enough when
> [Herman] knew full well [Baldwin] had already given it to them and Grenadier
> had lost the paperwork. This happened multiple times. [Herman] also sabotaged
> [Baldwin's] work by directing [her] to work on minor matters when [they] were
> pressed on a deadline for something much more significant like a HUD review.
>
> [In addition,] [a]fter [Baldwin's] deposition, Ms. Herman's pattern of having
> Grenadier hire and send vendors to Phelps House without even telling [Baldwin],
> therefore cutting [her] out of the loop on Phelps House maintenance issues,
> escalated. [Baldwin] sensed [she] was being pushed out.

(Id. ¶¶ 24-25) Rankin confirms that, beginning in July 2009, Herman "transferred more and

more of Mrs. Baldwin's responsibilities to Grenadier[,] . . . transferred some of Mrs. Baldwin's

billing and ordering duties to [Rankin,] . . . [and] treated Mrs. Baldwin like she didn't even

exist." (Id., Ex. 4 ("Rankin Aff.") ¶ 24) According to Rankin, "[f]rom that period on, Ms.

Herman treated Mrs. Baldwin in a hostile fashion[,] . . . chastised her all the time[,] . . . [and]

acted like Grenadier could do no wrong and that any problem that arose was Mrs. Baldwin's

fault (or [Rankin's fault])." (Id. ¶ 25)

Baldwin claims that Herman transferred "a substantial portion of [Baldwin's]

purchasing and invoice approval duties to Ms. Rankin in October 2009." (Id., Ex. 8 ("Pltf. Aff.")

¶ 32) According to Baldwin, in December 2009, Herman transferred responsibility for

"generating tenant income certifications, used for HUD compliance and other purposes, to

Grenadier" as well. (Id.) In the spring of 2010, Herman criticized Baldwin for failing to furnish certain documents to Grenadier. (Id.) According to Baldwin, Grenadier had lost these documents.[4] (Id.)

Herman arranged for a Grenadier employee to assist Baldwin with the June 2010 HUD audit, in which Phelps House received an "above average" rating. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 47, 48) Herman attributed the improved rating "pretty much" entirely to Grenadier. (Id. ¶ 49) Baldwin, however, claims that "Grenadier had little to no involvement in this review." (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 33)

In late summer 2010, Phelps House had a bed bug infestation. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 50) Herman recommended that Baldwin hire Tri State Cleaning to address the issue. (Id. ¶ 51) Baldwin claims that she attempted to hire Tri State Cleaning, but the vendor did not return her calls. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 36) Accordingly, Baldwin hired Prep for Bed Bugs. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 53) Baldwin did not obtain a written proposal or estimate before hiring this vendor, however, and it performed poorly. (Id. ¶¶ 54-55; see id. ¶ 56) Baldwin acknowledges that this vendor was "not the right selection." (See id. ¶ 54)

Herman testified that at about this time – the summer of 2010 – she decided that Baldwin should be terminated. (Tiliakos Decl. (Dkt. No. 33), Ex. B ("Herman Dep. Tr.") at 129)

---

[4] According to Rankin, "sometime in 2010," Russo called a meeting at Phelps House to announce that doors in the building had been modified to make the building more accessible to its handicapped tenants. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 27) "Despite the fact that Mrs. Baldwin had been the prime mover behind electrifying the doors," Russo gave credit to Colon. (Id.) Russo did not mention Baldwin, and the announcement was made while she was away on vacation. (Id.)

On October 6, 2010, Herman and Uy asked Baldwin to meet with them to discuss the bed bug infestation. (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 40)  When she arrived at the meeting, however, they presented her with a letter dated October 5, 2010, terminating her employment.  (Id.; id., Ex. 15; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 116)  The letter states:

> Dear Susan:
>
> Pursuant to the issues discussed and documented in the last several months, your employment at Goddard Riverside is terminated effective October 6, 2010.  Under the Personnel Policies, you are entitled to 30 days' notice of termination, which we will pay to you in lieu of notice on October 30, along with your accrued vacation of 20 days.
>
> Your medical benefits will end on the last day of the month in which your employment ended, or October 31, 2010. . . .
>
> Your participation in any life insurance plan, disability plan and any other benefit plan ends on the date of termination indicated above.  If you have any questions, contact Salvador Uy . . .
>
> Sincerely,
>
> Salvador Uy

(Bernstein Affirm. (Dkt. No. 42), Ex. 15)

Baldwin claims that "[she] had no idea [she] was going to be fired."  (Id., Ex. 8 ¶ 39)  According to Baldwin, "Herman hadn't warned [her] [that her] job was in jeopardy, and [she] had received no document or emails saying anything along the lines that [she] was performing so poorly that [she] was at risk of losing [her] job."  (Id.)  When Baldwin asked Herman and Uy why she was being terminated, she was told "insubordination."  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 118)  When Baldwin asked for the documentation referenced in the letter, Herman gave her a memorandum from 2008, and another document dated February

16

2009. (Id. ¶ 121)  Baldwin claims that she had never seen either document before.[5]  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.")  ¶ 40)

In deciding to terminate Baldwin, Herman consulted with Uy.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 60)  The parties dispute whether Russo was consulted as well. (Compare Def. R. 56.1 Stmt. ¶ 61, with Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 61)

According to Baldwin, "[b]y the time of [her] termination, Ms. Herman had stripped [her] of so many duties and given them to Grenadier that Grenadier became the face of Phelps House. . . . By the end of [Baldwin's] employment, a lot of [her] day-to-day was reduced to doing grunt work for Grenadier."  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 34) Rankin confirms that "[b]y the time Mrs. Baldwin was fired, many of her duties had been transferred to Grenadier."  (Id., Ex. 4 ("Rankin Aff.") ¶ 32)

Baldwin filed a grievance challenging her termination.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 64)  At "Step 1," her grievance was denied by Herman, and at "Step 2," her grievance was denied by Uy.  (Id. ¶¶ 65-66)  At "Step 3," her grievance was denied by the Executive Committee of Goddard's Board of Directors.  (Id. ¶¶ 67, 70)

## V.    PROCEDURAL HISTORY

In May 2011, Baldwin filed a Charge of Discrimination with the EEOC, alleging that Goddard had retaliated against her, and she received a Right to Sue letter on September 14,

---

[5] Although the parties do not further identify these documents, it appears from the record that the February 2009 document Baldwin is referring to is Herman's summary of their February 18, 2009 meeting.  (See Tiliakos Decl. (Dkt. No. 33), Ex. J)  That summary, in turn, makes reference to a July 7, 2008 letter from T.U.C. Management Company to Uy complaining that the tax credit recertification files – which Baldwin was responsible for maintaining – were "behind almost two years."  (Id., Ex. S)  The management company president states, "[w]e have been very lucky that the investor or HPD has not audited these files.  I am concerned that when they do, they will see that the [tax credit files] have not been maintained and hold us in noncompliance.  This means they could hold up our tax credits going forward or [that we could] even lose them."  (Id.)

2011.[6] (Am. Cmplt. (Dkt. No. 23) ¶ 71)  The Complaint in this action was filed on October 26,

2011 (Dkt. No. 1), and an Amended Complaint was filed on October 16, 2012.  (Dkt. No. 23)

## DISCUSSION

## I.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is warranted where the moving party shows that "there is no

genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment

purposes where the evidence is such that a reasonable jury could decide in the non-movant's

favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner,

480 F.3d 140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court

"resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in

favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d

Cir. 2001).

"In cases based on allegations of discriminatory retaliation, courts must use 'an

extra measure of caution' in determining whether to grant summary judgment[,] 'because direct

evidence of discriminatory intent is rare and such intent often must be inferred from

circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE)

(THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll

Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)); see also Ukeje v. N.Y.C. Health & Hosps. Corp.,

---

[6] The parties have not provided the Court with copies of the EEOC filing or the Right to Sue
letter. The Amended Complaint states that the EEOC complaint was filed on May 6, 2011.
(Am. Cmplt. (Dkt. No. 23) ¶ 71) Goddard states in its motion papers that the EEOC complaint
was filed on May 16, 2011. (Def. Br. (Dkt. No. 31) at 8)

821 F. Supp. 2d 662, 668 (S.D.N.Y. 2011) ("When a case turns on the intent of one party, as

employment discrimination and retaliation claims often do, a 'trial court must be cautious about

granting summary judgment.' Because the employer rarely leaves direct evidence of its

discriminatory or retaliatory intent, the Court must carefully comb the available evidence in

search of circumstantial proof to undercut the employer's explanations for its actions." (quoting

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)));

Batyreva v. N.Y.C. Dep't of Educ., No. 07 Civ. 4544 (PAC) (DF), 2010 WL 3860401, at *11

(S.D.N.Y. Oct. 1, 2010) ("Due to the highly fact-specific nature of the inquiry, an extra measure

of caution is needed in awarding summary judgment to a defendant where, as in a discrimination

or retaliation case, intent is at issue.").

    However, "'the salutary purposes of summary judgment – avoiding protracted,

expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of

litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting

Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)) (alterations in Abdu-Brisson). As in any

other case, a plaintiff in a retaliation case "must 'do more than simply show that there is some

metaphysical doubt as to the material facts.' . . . [Plaintiff] must come forth with evidence

sufficient to allow a reasonable jury to find in [Plaintiff's] favor." Brown v. Henderson, 257

F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation" by plaintiff is

not sufficient to defeat a summary judgment motion. Gross v. Nat'l Broad. Co., Inc., 232 F.

Supp. 2d 58, 67 (S.D.N.Y. 2002).

### B.   Title VII

Courts evaluate Title VII retaliation claims using a three-step burden-shifting

analysis:

> First, the plaintiff must establish a prima facie case. That is, an employee must
> show "(1) participation in a protected activity; (2) that the defendant knew of the
> protected activity; (3) an adverse . . . action; and (4) a causal connection between
> the protected activity and the adverse . . . action." McMenemy v. City of
> Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001). The burden of proof that must
> be met to permit a Title VII plaintiff to survive a summary judgment motion at the
> prima facie stage has been characterized as "'minimal' and 'de minimis.'"
> Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmermann
> v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)). In determining
> whether this initial burden is satisfied in a Title VII retaliation claim, the court's
> role in evaluating a summary judgment request is to determine only whether
> proffered admissible evidence would be sufficient to permit a rational finder of
> fact to infer a retaliatory motive. See Donahue v. Windsor Locks Bd. of Fire
> Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).
>
> If a plaintiff sustains the initial burden, a presumption of retaliation arises. In
> turn, under the second step of the burden-shifting analysis, the onus falls on the
> employer to articulate a legitimate, non-retaliatory reason for the
> adverse . . . action. See [Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d
> Cir. 1998)]. Finally, as for the third step, once an employer offers such proof, the
> presumption of retaliation dissipates and the employee must show that retaliation
> was a substantial reason for the adverse . . . action.

Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).[7]

A plaintiff may show retaliatory intent with direct evidence "of retaliatory animus

directed against the plaintiff," or with circumstantial evidence, including evidence that "the

protected activity was followed closely by discriminatory treatment," or evidence of "disparate

treatment of fellow employees who engaged in similar conduct." Raniola v. Bratton, 243 F.3d

---

[7] Baldwin's retaliation claims are subject to the same burden-shifting analysis under federal and
state law. See Schiano, 445 F.3d at 609 ("[R]etaliation claims under the NYSHRL are generally
governed by the same standards as federal claims under Title VII."); White v. Pacifica Found.,
973 F. Supp. 2d 363, 383 (S.D.N.Y. 2013) ("Plaintiff's retaliation claims – brought pursuant to
the NYSHRL and the NYCHRL – are also analyzed under the three-step McDonnell Douglas
burden-shifting framework.").

610, 625 (2d Cir. 2001) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)); see also McNair v. N.Y.C. Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001).

## II.    ANALYSIS

In determining whether Baldwin has established a prima facie case of retaliation, the first question is whether she engaged in a protected activity and, if so, whether that activity was known to Goddard.  Baldwin claims that she engaged in the following conduct that constitutes protected activity:  (1) informing Herman that Russo had instructed her to pass over Russian housing applicants; and (2) introducing Robles to a lawyer in early 2008, submitting her list of revisions to Goddard's insurance carrier, and giving a deposition in Robles's discrimination lawsuit. (Pltf. Br. (Dkt. No. 43) at 12)  Goddard concedes for purposes of this motion that Baldwin engaged in protected activity known to both Herman and Uy. (Def. Br. (Dkt. No. 31) at 2)

As to the next element of the analysis – the adverse action – Goddard does not dispute that Baldwin's termination was an adverse action.  (See id. at 11)  Goddard argues, however, that none of the alleged retaliatory acts that occurred prior to Baldwin's termination rise to the level of an adverse action, and that Baldwin's Title VII claims relating to any acts that occurred prior to 300 days before Baldwin filed her EEOC Complaint are time-barred. (Def. Br. (Dkt. No. 31) at 8-9 & n.4)  Baldwin contends, however, that she has offered proof of "a 'continuing violation' . . . [involving] an ongoing pattern [of] retaliation creating a hostile work environment in the aggregate." (Pltf. Br. (Dkt. No. 43) at 14)

The Court need not determine whether any of the alleged pre-termination actions constitute an "adverse action," however, because – even assuming arguendo that they do –

21

Baldwin has not offered sufficient evidence concerning the last element of a prima facie case: "a causal connection between the protected activity and the adverse . . . action." Jute, 420 F.3d at 173. No reasonable jury could conclude here that the actions cited by Baldwin were in retaliation for (1) her refusal to pass over Russian applicants to Phelps House; or (2) any assistance that she provided to Robles in connection with his discrimination suit.

To establish a prima facie case of retaliation, Baldwin must offer evidence from which a jury could infer a causal connection between the actions and her protected activity. "A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'" Elhanafy v. Shinseki, No. 10 CV 3192 (JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting Ashok v. Barnhart, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (quoting McNair, 160 F. Supp. 2d at 604)); see also Beaumont v. Cablevision Sys. Corp., No. 10–CV–3585 (JG) (SMG), 2012 WL 1158802, at *6 (E.D.N.Y. Apr. 9, 2012) ("'[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action."'" (quoting Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)))).

Here, Baldwin does not contend that there is any direct proof of retaliatory animus, nor has she argued that she was treated differently than similarly situated employees. Accordingly, she relies on temporal proximity in attempting to demonstrate a causal connection between the alleged adverse actions and her protected activity. (See Pltf. Br. (Dkt No. 43) at 14-17)

"Th[e] [Second Circuit] has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos, 252 F.3d at 554. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse . . . action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'" however. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). As a general matter, "'[d]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse . . . action does not allow for an inference of causation.'" Williams v. Woodhull Med. & Mental Health Ctr., No. 10 CV 1429 (NGG) (LB), 2012 WL 555313, at *2 (E.D.N.Y. Jan. 31, 2012), report and recommendation adopted sub nom., Williams v. Woohdull Med. & Mental Health Ctr., No. 10-CV-1429 (NGG) (LB), 2012 WL 567028 (E.D.N.Y. Feb. 21, 2012) (quoting Garrett v. Garden City Hotel, Inc., No. 05-CV-0962 (JFB) (AKT), 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007)). Stated another way, "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); see also Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F. Supp. 2d 498, 529 (S.D.N.Y. 2007), aff'd sub nom., Woods v. Newburgh Enlarged City Sch. Dist., 288 F. App'x 757 (2d Cir. 2008) (collecting cases); Gentile v. Potter, 509 F. Supp. 2d 221, 239 & n.9 (E.D.N.Y. 2007) (dismissing retaliation claim premised on act that occurred four months after protected activity where there was no direct evidence of retaliation); Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed

when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.").

### A.   Causal Connection Between Baldwin's Acceptance of Russian Applicants and Adverse Actions

Baldwin alleges that Goddard retaliated against her because she refused to pass over Russian applicants to Phelps House, as Russo had instructed her to do on approximately six occasions between 2005 and 2008 or 2009. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 23, 28) Although Baldwin told Russo that she would not pass over prospective Russian applicants (id. ¶ 27), and indeed accepted Russian applicants throughout the 2005 to 2009 time period (id. ¶¶ 32, 33), Baldwin "does not allege that she was subjected to retaliation for her opposition to housing discrimination until late 2008" – three years after Russo first raised the issue of accepting Russian applicants. (Pltf. Br. (Dkt. No. 43) at 19)  Moreover, although Baldwin marks "late 2008 [as when] the atmosphere beg[a]n to change in terms of how [her] superiors were treating [her]" (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19), Baldwin consistently and repeatedly attributes that change – at least as to Russo – to the July 2009 deposition she gave in the Robles matter, and not to any action she took concerning Russian applicants:

> "After my deposition [in the Robles matter], Mr. Russo ostracized me completely." (id. ¶ 23)

> "[P]rior to her deposition [in July 2009], [Baldwin] had a relatively cordial relationship with Mr. Russo.  He would poke his head into her office from time to time, and would call her directly whenever there was a facilities issue with Phelps House."  (Am. Cmplt. (Dkt. No. 23) ¶ 53)

> "Subsequent to her deposition, Mr. Russo isolated and avoided Susan.  He stopped calling Susan directly, and instead would communicate [with] . . . Doris Colon, the Director of Social Services. . . . Mr. Russo would also communicate to Susan through Catherine Herman on issues where he previously would have simply picked up the phone and Susan."  (Id. ¶ 54)

24

"After her deposition, Mr. Russo became cold towards Susan, and his physical visits to her office diminished drastically. Whereas previously he had stopped by Susan's office when he was visiting the facility, Mr. Russo would now spend his time at Phelps House in the social service department. On the rare occasions when he was in Susan's section of the building, Mr. Russo would ignore Susan and speak to her assistant, Mercedes Rankin, instead." (Id. ¶ 55)

"Previously Mr. Russo would say hi to Susan at monthly director meetings and nonverbally solicit her reaction to points he was making at the meetings. After her deposition, Mr. Russo ignored Susan at these meetings entirely." (Id. ¶ 56)

"Subsequent to Susan's deposition, Mr. Russo began to give credit for positive developments Susan was responsible for to individuals who had nothing to do with the issue at hand." (Id. ¶ 57)

In sum, Baldwin has alleged that the change in Russo's attitude came after the deposition she gave in the Robles discrimination case. Baldwin has not linked any change in Russo's attitude towards her to her treatment of Russian applicants, and there is no evidence that Russo's treatment of Baldwin changed within three months of any conversation they had related to Russian applicants.

Assuming arguendo that Russo played a role in Baldwin's October 2010 termination, that action took place at least ten months after any conversation between Russo and Baldwin about Russian applicants. Baldwin has not alleged any facts suggesting that she spoke with anyone about Russian applicants in 2010.

Given this record, Baldwin has not demonstrated any causal connection between her acceptance of Russian applicants and any adverse action or change in attitude by Russo.

As to Herman, Baldwin claims that she was not "subjected to retaliation for her opposition to housing discrimination until . . . after she raised the issue with Herman." (Pltf. Br. (Dkt. No. 43) at 19) Baldwin argues that Goddard "began retaliating against [her] in close temporal proximity to her raising the Russians issue to Herman," pointing to an incident in December 2008 in which Herman brought Grenadier into Phelps House without Baldwin

present. (See Pltf. Br. (Dkt. No. 43) at 13; Bernstein Affirm. (Dkt. No. 42), Ex. 6 ("Pltf. Dep. Tr.") at 358; id., Ex. 8 ("Pltf. Aff.") ¶ 19)  Although this incident took place within a month or two of Baldwin's conversation with Herman regarding Russian applicants, it is undisputed that Herman told Baldwin to continue accepting Russian applicants.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 35; Am. Cmplt. (Dkt. No. 23) ¶¶ 22-24)  It is likewise undisputed that Herman subsequently instructed Russo that passing over Russian applicants would be illegal. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 81)  Under these circumstances, no reasonable jury could conclude that Herman retaliated against Baldwin for accepting Russian applicants to Phelps House.

Accordingly, to the extent that Baldwin's retaliation claims relate to her acceptance of Russian applicants to Phelps House, Defendant is entitled to summary judgment on those claims.

**B.    Causal Connection Between Baldwin's
        Support for Robles and Adverse Actions**

Baldwin alleges that she helped Robles obtain a lawyer in late 2007 or early 2008, and that – after meeting with an investigator for Goddard's insurance carrier on July 22, 2008 and receiving a summary of his interview report – she sent a list of revisions to the carrier on or about July 30, 2008.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 14-15; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶¶ 89-90; Tiliakos Decl. (Dkt. No. 33), Ex. A ("Pltf. Dep. Tr.") at 62, 67; Bernstein Affirm. (Dkt. No. 42), Ex. 7)  The first instance of "retaliation" that Baldwin claims she suffered as a result of her involvement in the Robles case occurred in December 2008, however, when Herman permitted Grenadier to visit Phelps House and gave Grenadier staff access to Baldwin's files while Baldwin was on leave..  (Bernstein Affirm. (Dkt. No. 42), Ex. 8 ("Pltf. Aff.") ¶ 19)

As an initial matter, Baldwin has offered no evidence that Herman's admission of Grenadier to Phelps House relates in any way to Baldwin's involvement in the Robles matter. Baldwin acknowledges that Grenadier was scheduled to replace Goddard's former management company on January 1, 2009, and does not allege that the hiring of Grenadier had anything to do with Baldwin's involvement in the Robles case. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 39) Moreover, given that Grenadier would assume certain management responsibilities at Phelps House as of January 1, 2009, it makes sense that Herman would bring Grenadier into the building and begin familiarizing Grenadier staff with Phelps House systems in December 2008.

Baldwin has produced no evidence from which a reasonable juror could conclude that Herman's decision to bring in Grenadier in December 2008 – while Baldwin was on leave – was retaliation for any assistance or support Baldwin had provided to Robles in late 2007 or mid-2008. Moreover, the five month gap between Baldwin's alleged assistance to Robles and the Grenadier visit is too long a lapse in time to support a causal connection between Baldwin's protected activity and the alleged adverse employment action. See, e.g, Woods, 473 F. Supp. 2d at 529 ("[I]n the present case, construing the record in the light most favorable to plaintiff, plaintiff complained to Johns of racial discrimination on July 18, 2003, and Johns first notified plaintiff of her termination on December 18, 2003. Thus, there was a five-month interval between her complaint of racial discrimination and her termination. As is evident from the case law in this circuit, in the absence of other evidence of retaliatory motive, such a time lapse precludes a finding of causal connection between the protected activity and the adverse employment action based on temporal proximity.").

Baldwin's remaining allegation of protected activity in connection with Robles is her June 22, 2009 deposition. As noted above, Baldwin alleges that a long series of adverse

27

actions were taken against her – by both Russo and Herman – in retaliation for testimony at the June 22, 2009 deposition, culminating in her October 6, 2010 termination.  (See Am. Cmplt. (Dkt. No. 23) ¶¶ 53-63)  The undisputed evidence demonstrates, however, that adverse actions about which she complains – including Russo's coldness, Herman's complaints about her work, the shift of her responsibilities to Grenadier – all began before Baldwin gave her June 22, 2009 deposition.  The undisputed evidence also demonstrates that Baldwin's supervisors – Herman and UY – began discussing firing her long before the June 22, 2009 deposition.

According to Baldwin, she began having disagreements with Herman regarding Grenadier from almost the moment Grenadier took over management duties at Phelps House in January 2009.  (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶¶ 41-44)  These disagreements are reflected in contemporaneous emails between Baldwin and Herman in February and March 2009.  (See, e.g., Bernstein Affirm. (Dkt. No. 42), Exs. 18, 19)  These disagreements culminated in a February 18, 2009 meeting between Herman and Baldwin, in which the two discussed Baldwin's refusal to use Grenadier's new property management system. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 42)

Baldwin concedes that she was "shrill" with Herman during this meeting, and that she upset Herman.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 43)  Herman's contemporaneous written summary of that meeting (Tiliakos Decl. (Dkt. No. 33), Ex. J) reveals that she found Baldwin's vehement refusal to use the new system to constitute "aggression and insubordination" so extreme as to suggest that Baldwin wanted "to be fired as a way out of a job that had become too stressful." (Id.)  Although Herman recounts that Baldwin apologized, she also notes that she had heard Baldwin's "anger and frustration before."  Herman also states that she believes that Baldwin is "undermining the transition to the new property management

28

company," and she alludes to the fact that Baldwin and Rankin have fallen far behind in doing the necessary paperwork to preserve Phelps House's tax credits. (Id.) It is also apparent that Herman believes that Baldwin is not properly supervising Rankin, who was watching a TV show when Herman showed up for an important meeting. (Id.) It is likewise apparent that Herman has significant doubts about whether Baldwin is "up to" the job. (Id.) Indeed, Herman asked Baldwin whether she believed that she was "up to doing th[e] job." (Tiliakos Decl. (Dkt. No. 33), Ex. B ("Herman Dep. Tr.") at 129)

The undisputed evidence also demonstrates that in the days following Herman's February 18 meeting with Baldwin, she and Uy discussed Baldwin's work performance, and concluded that, absent improvement, she would have to be terminated. (See, e.g., Bernstein Affirm. (Dkt. No. 42), Ex. 13 ("Uy Dep. Tr.") at 52, 57-58; id., Ex. 14) Herman believed, at that time, that the deficiencies in Baldwin's performance were significant enough to warrant termination. (Tiliakos Decl. (Dkt. No. 33), Ex. B ("Herman Dep. Tr.") at 127) Moreover, in a February 22, 2009 email to Russo and a Goddard Board member, Uy stated that he believed that he and Herman would be firing Baldwin "sooner or later." (Bernstein Affirm. (Dkt. No. 42), Ex. 14; id., Ex. 13 ("Uy Dep. Tr.") at 60) In sum, the undisputed evidence indicates that by February 2009 – long before Baldwin's June 22, 2009 deposition – Baldwin's supervisors were already seriously considering terminating her employment, and preparing for that possibility.

At this same time, Herman began transferring Baldwin's duties to Grenadier. (See id, Ex. 8 ("Pltf. Aff.") ¶ 20) According to Baldwin, by spring 2009, Grenadier and Herman had started contracting third party vendors to perform work at Phelps House without notifying Baldwin in advance. (Id.) Baldwin's supervisors also began distancing themselves from her at that time. For example, according to Rankin, Russo "gave Mrs. Baldwin the cold shoulder at an

annual directors meeting" in spring 2009 and introduced another employee as the building manager, instead of Baldwin. (Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶ 23)  All of these changes occurred before Baldwin's deposition in the Robles's case on June 22, 2009.

While Baldwin claims that she experienced increased hostility from her supervisors after her deposition, this allegation ignores the fact that on June 15, 2009 – just one week before Baldwin's deposition – HUD had issued its audit report in which Phelps House had received a "below average" rating and a rating of "below average in leasing and occupancy." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 46) ¶ 45; Bernstein Affirm. (Dkt. No. 42), Ex. 10) Baldwin – as building manager – bore responsibility for the outcome of that audit – the first below average rating Phelps House had received in at least fifteen years. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 37) ¶ 75; Tiliakos Decl. (Dkt. No. 33), Ex. A ("Pltf. Dep. Tr.") at 19-21; see Bernstein Affirm. (Dkt. No. 42), Ex. 4 ("Rankin Aff.") ¶¶ 4, 29)

Even assuming that the treatment Baldwin received after her deposition could be considered adverse action, temporal proximity between those events and the deposition is not sufficient to demonstrate causation.  "Employers need not suspend previously planned [actions] upon discovering that a [protected activity occurred], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark Cnty. Sch. Dist., 532 U.S. at 272.  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), as amended (June 6, 2001).  Here, "[s]ince [the record] establishe[s] that [Baldwin's] supervisors began the process of terminating her employment before she engaged in protected activity, she cannot rely on temporal proximity to

satisfy the causal connection element of a prima facie case of Title VII retaliation." Risco v.

McHugh, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012); see also Slattery, 248 F.3d at 95 ("The only

basis Slattery suggests for finding . . . a [causal] nexus is time. He claims that his placement on

probation and his subsequent firing followed his complaints closely enough to support an

inference of retaliation. . . . [I]n this case the adverse employment actions were both part, and the

ultimate product, of 'an extensive period of progressive discipline' which began when Swiss Re

diminished Slattery's job responsibilities a full five months prior to his filing of the EEOC

charges.") (emphasis in original); White, 973 F. Supp. 2d at 385 ("Pacifica's decision to address

Plaintiff's poor performance and misconduct was set in motion before Plaintiff sent his May 4,

2009 [discrimination] complaint. The fact that Pacifica later decided to suspend Plaintiff again

and ultimately to terminate him – after he sent the May 4, 2009 complaint – is not proof of

retaliation, because it is clear that Pacifica was 'proceeding along lines previously contemplated,

though not yet definitively determined.'") (quoting Clark Cnty. Sch. Dist., 532 U.S. at 272);

Spadola v. N.Y.C. Transit Auth., 242 F. Supp. 2d 284, 294-95 (S.D.N.Y. 2003) ("Though

Spadola points to the proximity between the filing of his EEOC charge on November 14, 1997

and his second dismissal on November 24, 1997 as sufficient causation, this evidence is not

dispositive. The investigation that led to the Authority's disciplinary proceeding arising out of

the false overtime charges commenced sometime in July and the administrative proceedings

were well underway at the time Spadola filed his EEOC charge. Under these circumstances, the

Authority was not obligated to automatically cease or abandon an ongoing internal disciplinary

procedure merely because an employee files a charge alleging discrimination."); Holmes v. Long

Island R.R. Co., No. 96 CV 6196 (NG), 2001 WL 797951, at *8 (E.D.N.Y. June 4, 2001) ("In

the present case, . . . plaintiff Holmes relies upon the temporal proximity between her filing of

charges with the State Division of Human Rights and the initiation of proceedings that resulted

in her discharge, but . . . no facts show a causal connection between protected activities and her

discharge.  There is no evidence that LIRR knew that plaintiff was about to file or had filed

charges when it sent her for drug testing and then began proceedings for her discharge after the

tests revealed that she had used an illegal controlled substance.  LIRR's continuation of those

proceedings, which resulted in plaintiff's termination, is no evidence whatever of causality.")

(internal citations and quotations omitted).

   Here, viewing the record as a whole, no reasonable factfinder could conclude that

Goddard's actions following Baldwin's deposition were taken in retaliation for her testimony.

Moreover, the conduct about which Baldwin complains – for at least the first three months after

the deposition – consists exclusively of minor incivilities, friction with Herman, and Herman's

continued transfer of job responsibilities from Baldwin to Grenadier and, to a lesser extent, to

Rankin.  These acts are consistent with the conduct of Baldwin's supervisors prior to her

deposition, however, and with their conclusion in February 2009 that Baldwin's termination

might prove necessary.  The failed HUD review, the continued disorganization in Baldwin's

files, and her conceded mishandling of the bed bug infestation (see Pltf. Resp. to Def. R. 56.1

Stmt. (Dkt. No. 46) ¶¶ 53-55) confirmed Herman and Uy's view – in February 2009 – that

deficiencies in Baldwin's work performance warranted her termination.  See DeCintio v.

Westchester Cnty. Med. Ctr., 821 F.2d 111, 120 (2d Cir. 1987) ("[T]here are no genuine material

issues of fact that can 'reasonably' be resolved in DeCintio's favor to support his claim of

retaliation.  This simply is a case where a[n] [employee] was derelict in h[er] duties and was

fired for [her] derelictions.").

As to the termination itself, it did not occur until fifteen months after Baldwin's deposition. "This [temporal] gap is too wide to support the inference that [Baldwin] was terminated in retaliation for complaining about discrimination, and [she has] failed to adduce any other evidence to indicate that her discharge was the product of retaliatory animus." Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 447 (2d Cir. 1999).

Baldwin has relied entirely on temporal proximity in attempting to demonstrate a causal connection between her protected activity and alleged adverse actions (see Pltf. Br. (Dkt. No. 43) at 14-17), and she has produced "no other evidence of a retaliatory motive to satisfy the casual connection requirement; therefore, she has not made out a prima facie case of Title VII retaliation." Risco, 868 F. Supp. 2d at 113-14; see also Ruggieri v. Harrington, 146 F. Supp. 2d 202, 219 (E.D.N.Y. 2001) ("As [plaintiff] is . . . unable to show a causal connection between her [alleged protected activity] and the conduct in question, even supposing that she did suffer some adverse employment action, she fails to meet her burden of establishing a prima facie case of retaliation. Summary judgment is therefore appropriate."). Accordingly, Goddard is entitled to summary judgment on Baldwin's discrimination claims to the extent that they relate to the assistance and support she provided to Robles in connection with his discrimination case.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motion (Dkt. No. 30), and to close this case.

Dated: New York, New York
       September 27 2014

                                          SO ORDERED.

                                          Paul G. Gardephe
                                          United States District Judge